757 A.2d 338

Walter H. and Leonore ANNENBERG, Petitioners,

v.

COMMONWEALTH of Pennsylvania and D. Michael Fisher, Attorney General of the Commonwealth of Pennsylvania and Board of Commissioners of the County of Montgomery, being Richard Buckman, Joseph Hoeffel and Mario Mele (solely in their official capacities) and Board of Assessment Appeals of the County of Montgomery and County of Montgomery, Respondents.

County Commissioners' Association of Pennsylvania and the Boards of County Commissioners of Adams, Chester, Dauphin, Indiana, Lackawanna, Schuylkill, Warren and York Counties [1], Intervenors.

Walter H. Annenberg, as Sole Trustee of the Trust Under the Will of Moses L. Annenberg, Petitioner,

v.

Commonwealth of Pennsylvania and D. Michael Fisher, Attorney General of the Commonwealth of Pennsylvania and Board of Commissioners of the County of Montgomery, being Richard Buckman, Joseph Hoeffel and Mario Mele (solely in their official capacities) and Board of Assessment Appeals of the County of Montgomery and County of Montgomery, Respondents.

County Commissioners' Association of Pennsylvania and the Boards of County Commissioners of Adams, Chester, Dauphin, Indiana, Lackawanna, Schuylkill, Warren and York Counties, Intervenors.

Supreme Court of Pennsylvania.

Submitted May 15, 1997.

Resubmitted Dec. 28, 1999.

Decided June 1, 2000.

1. These parties were granted intervenor status in this matter pursuant to a *per curiam* order of this Court, dated June 26, 1998. They shall be referred to hereafter as the Intervenor–Counties.

582

584

William J. Henrich, Jr., Peter J. Picotte, II, Maura E. Fay, Philadelphia, for Walter H. and Leonore Annenberg.

Steven H. Lupin, Mark F. Himsworth, Steven A. Hann, Lansdale, for Bd. of Com'rs Montgomery County, et al.

Richard A. Sprague, Denise Pallante, Philadelphia, for Intervenors.

Before FLAHERTY, C.J., and ZAPPALA, CAPPY, CASTILLE, NIGRO, NEWMAN and SAYLOR, JJ.

## OPINION

ZAPPALA, Justice.

We exercised plenary jurisdiction[2] over these matters to determine whether Section 4821 of the Act of June 17, 1913, P.L. 507, *as amended,* 72 P.S. §§ 4821–4902, is unconstitutional as it violates the Commerce Clause of the United States Constitution.[3] On April 7, 1998, we issued an opinion and order holding that the stock clause of the personal property tax (stock clause), 72 P.S. § 4821, facially discriminated against interstate commerce. *Annenberg v. Commonwealth,* 562 Pa. 570, 757 A.2d 333 (1998) (*Annenberg I*). We remanded the matter to the Court of Common Pleas of Montgomery County for a hearing to be held and an interim report to be issued on whether the stock clause was a "compensatory tax." Following a hearing, an Interim Report was issued by President Judge Joseph A. Smyth of Montgomery County. After reviewing this Interim Report, the record and the filings by all parties, we conclude that the portion of the stock clause which excludes from the personal property tax stock held in companies which are subject to the capital stock and franchise taxes is unconstitutional.

As detailed in our opinion in *Annenberg I,* Walter H. Annenberg, as the Sole Trustee for the Trust under the Will of Moses L. Annenberg, and Walter H. and Leonore Annen-

---

**2.** 42 Pa.C.S. § 726.

**3.** U.S. Const. art. I, § 8, cl. 3.

berg, filed petitions for review in the Commonwealth Court seeking a declaration that the stock clause of the personal property tax [4] violates the Commerce Clause of the United States Constitution and is therefore null and void insofar as it imposes a tax on any corporate stock held by them. The Commonwealth Court declined to exercise jurisdiction over this matter. Subsequently, the Annenbergs filed a petition with this Court, asking that we exercise plenary jurisdiction over this matter. We granted the Annenbergs' petition.

On April 7, 1998, we issued our *Annenberg I* opinion. We reasoned that the United States Supreme Court's recent ruling in *Fulton Corp. v. Faulkner*, 516 U.S. 325, 116 S.Ct. 848, 133 L.Ed.2d 796 (1996), compelled a finding that the stock clause facially discriminated against interstate commerce. However, we did not declare that the stock clause was unconstitutional at that point. Rather, we noted that a tax provision which is facially discriminatory may nonetheless avoid being

4. The statute which imposes the personal property tax consists of over 2,400 words, contained in three sentences, comprising two paragraphs. 72 P.S. § 4821. While the personal property tax applies to several classes of property, we are here concerned with its application to only one class of property: stock. The statute states in pertinent part that

[the personal property tax shall be due on] all shares of stock in any bank, corporation, association, company or limited partnership, created or formed under the laws of this Commonwealth or of the United States, or of any other state or government, except shares of stock in any bank, bank and trust company, national banking association, savings institution, corporation, or limited partnership liable to a tax on its shares or a gross premiums tax, *or liable to or relieved from the capital stock or franchise tax for State purposes under the laws of this Commonwealth* ....

72 P.S. § 4821 (emphasis supplied).

The portion of the stock clause tax which the Annenbergs attacked as being unconstitutional is underscored above. That phrase excludes from the personal property tax stock held in entities to which the capital stock and franchise tax apply. The capital stock tax applies to companies organized under the laws of this Commonwealth, 72 P.S. § 7602(a). The franchise tax, on the other hand, is owed by entities which are organized in any jurisdiction other than this Commonwealth which also do business in and are liable to taxation in this Commonwealth. 72 P.S. §§ 7602(b) and 7601. Thus, the net effect of the stock clause is that "the only stock on which an owner is liable to pay tax pursuant to the stock clause is on stock in foreign corporations which do not do business in Pennsylvania." *Annenberg I*, 562 Pa. at 576–77, 757 A.2d at 336.

declared null and void where the government is able to overcome the presumption of invalidity "by showing that the statute is a 'compensatory tax' designed simply to make interstate commerce bear a burden already borne by intrastate commerce." *Annenberg I*, 562 Pa. at 576, 757 A.2d at 335 (citing *Fulton*). As the inquiry into whether the stock clause is a compensatory tax is largely factual in nature, we directed the Court of Common Pleas of Montgomery County to conduct a hearing on the compensatory tax issue and retained jurisdiction.

President Judge Joseph A. Smyth conducted hearings in which the Annenbergs, the County of Montgomery and the Intervenor–Counties (collectively the Counties) participated. After the close of hearings, President Judge Smyth filed his Interim Report with this Court on October 7, 1998. President Judge Smyth found that the Counties had not met their burden of proving that the stock clause is a compensatory tax and thus concluded that the exclusionary language in the stock clause was unconstitutional. Interim Report at 22. However, President Judge Smyth reasoned that the statute need not be struck down in its entirety. Rather, he posited that the language of the statute which excluded from taxation stock subject to the capital stock or franchise tax could be severed from 72 P.S. § 4821, leaving a personal property tax which applied to all classes of stock, whether they be held in out-of-state or in-state corporations. Interim Report at 25. Finally, President Judge Smyth declared that the Counties should be able to keep the tax which had been previously collected under the stock clause. Interim Report at 26. In arriving at this conclusion, President Judge Smyth stated that once the unconstitutional exclusion was severed from the stock clause, leaving a tax which was applicable to stock held in either out-of-state or in-state entities, then a valid tax remained; President Judge Smyth reasoned that in that event, the "[C]ounties should be permitted to retain and collect the personal property tax on stock that is not subject to the capital stock or franchise taxes." Interim Report at 26.

■   In determining our proper scope and standard of review of the Interim Report, we are presented with a seemingly unique procedural situation: we exercised plenary jurisdiction over these matters; we subsequently directed that another tribunal essentially act as a special master and hold hearings and issue a report, but did not relinquish our jurisdiction to that other tribunal.  At this juncture, we are now reviewing the Interim Report containing the proposed findings of fact and conclusions of law.[5]  We find that in matters such as these where we have exercised plenary jurisdiction and have not relinquished that jurisdiction to the tribunal which is in essence acting as a special master for this Court, our review must be *de novo*.  We note, however, that when addressing the findings of fact made by President Judge Smyth, although such findings are not binding on us, we will afford them due consideration, as the jurist who presided over the hearings was in the best position to determine the facts.  *Cf. Zimmerman v. Zimmerman*, 428 Pa. 118, 236 A.2d 785 (1968) (in a divorce proceeding, the findings of a master, although not binding on the court, are entitled to due consideration as the master had the opportunity to hear and to observe the witnesses and was thus in a better position to pass upon the credibility of such witnesses); *see also Snyder v. Snyder*, 533 Pa. 203, 620 A.2d 1133 (1993).

■   We now turn to the substantive issue of whether the stock clause is a compensatory tax.  Where a taxation statute

**5.**  We recognize that the matter of *Masloff v. Port Authority of Allegheny County*, 531 Pa. 416, 613 A.2d 1186 (1992), wherein this Court stated that it would employ a variant of the abuse of discretion standard in reviewing the findings of the "chancellor" below, shares some common procedural elements with the matter *sub judice*.  In *Masloff*, we exercised plenary jurisdiction over the matter prior to any action being taken by a lower court.  We then remanded the matter to the Commonwealth Court to hold hearings.  Up until this point, *Masloff* is strikingly similar to the matter at hand.  In *Masloff*, the Commonwealth Court sitting in equity had the power to enter a permanent injunction—a power which it exercised.  In this matter, however, President Judge Smyth had no power to issue such an order as we retained jurisdiction.  Thus, President Judge Smyth necessarily had no discretion which he could exercise.  Thus, we do not find that it would be appropriate to apply the *Masloff* standard here as *Masloff* is distinct in a crucial way.

has been determined to facially discriminate against interstate commerce, a state may overcome the presumption of invalidity by showing that the statute is a " 'compensatory tax' designed simply to make interstate commerce bear a burden already borne by intrastate commerce." *Fulton,* 516 U.S. at 331, 116 S.Ct. 848 (citations omitted). It must be shown that the tax "advances a legitimate local purpose that cannot be adequately served by reasonably nondiscriminatory alternatives." *New Energy Co. of Indiana v. Limbach,* 486 U.S. 269, 278, 108 S.Ct. 1803, 100 L.Ed.2d 302 (1988). In a truly compensatory tax scheme, "the stranger from afar is subject to no greater burdens as a consequence of ownership than the dweller within the gates. The one pays upon one activity or incident, and the other upon another, but the sum is the same when the reckoning is closed." *Oregon Waste Systems, Inc. v. Department of Environmental Quality of Oregon,* 511 U.S. 93, 103, 114 S.Ct. 1345, 128 L.Ed.2d 13 (1994) (citing *Henneford v. Silas Mason Co.,* 300 U.S. 577, 57 S.Ct. 524, 81 L.Ed. 814 (1937)). The state bears an extraordinarily heavy burden in making this showing. *Hughes v. Oklahoma,* 441 U.S. 322, 337, 99 S.Ct. 1727, 60 L.Ed.2d 250 (1979).

For a tax to be considered a valid compensatory tax, it is incumbent upon the governmental entity to establish three things. First, as a threshold matter, the government must identify the intrastate tax burden for which the facially discriminatory tax is compensating. *Fulton,* 516 U.S. at 332, 116 S.Ct. 848. This prong cannot be met unless the government establishes that the tax on interstate commerce "is fairly related to the services provided by the State [which benefit interstate commerce]." *Id.* at 334, 116 S.Ct. 848 (citations omitted). Second, the "tax on interstate commerce must be shown roughly to approximate—but not exceed—the amount of the tax on intrastate commerce." *Id.* at 332–33, 116 S.Ct. 848 (citations and internal quotation marks omitted). Finally, the government must show that "the events on which the interstate and intrastate taxes are imposed must be 'substantially equivalent'; that is, they must be sufficiently similar in substance to serve as mutually exclusive 'prox[ies] for each

other.'" *Id.* at 333, 116 S.Ct. 848 (citations omitted). The three prong *Fulton* test is stated in the conjunctive; thus, failure to meet one of any of the three prongs results in a finding that the governmental entity has failed to meet its burden in establishing that the discriminatory tax is nonetheless valid as a compensatory tax.

As to the first prong of the *Fulton* compensatory tax test, the Counties argue that the legislature crafted the stock clause as part of a comprehensive taxing scheme in order to compensate for the taxes exacted by the capital stock and franchise taxes. We must reject this argument for two reasons.

First, we find that the Counties' argument that the personal property tax, including the stock clause, was part of a comprehensive taxing scheme created by the legislature is belied by the history of the enactment of these taxes. The first personal property tax was enacted in 1831. This tax reached all stock held by Pennsylvania residents and the revenues from this tax went to the Commonwealth's, rather than the Counties', coffers. Act of March 25, 1831, P.L. 206.

The first capital stock tax was not enacted until 1840. Act of June 11, 1840, P.L. 612. This capital stock tax applied only to Pennsylvania corporations. In 1868, the legislature expanded the capital stock tax to reach foreign corporations doing business in Pennsylvania. Act of May 1, 1868, P.L. 108. The legislature amended the personal property tax law by excluding any stock held in corporations which were liable for the capital stock tax. Act of June 1, 1889, P.L. 420. A further amendment to the personal property tax took place in 1913 when the personal property tax became a county tax.

In 1935, the legislature amended the capital stock tax so that the stock held in foreign corporations doing business in Pennsylvania would be taxed under the franchise tax, and not the capital stock tax. Act of May 16, 1935, P.L. 184. In 1939, the legislature amended the personal property tax to make clear that stock in companies liable to the franchise tax were

also exempt from the personal property tax. Act of June 19, 1939, P.L. 413.[6]

Finally, in 1978, the legislature amended the personal property tax, allowing the counties the option of levying what had previously been a mandatory tax. 72 P.S. § 4821.1. Since that time, many counties have opted to cease collecting the personal property tax; at present, only a third of the counties collect this tax. Interim Report at ¶¶ 43 and 44.

Upon review, we agree with President Judge Smyth that these taxes were not an integrated, comprehensive system of taxation. President Judge Smyth concluded that history shows that these taxes "developed independent of each other throughout their histories ... [and that] [a]t no time was there a correlation between the taxes." Interim Report at ¶ 37. The evidence does not support the contention that the legislature enacted these taxes as part of an interconnected scheme; we thus adopt President Judge Smyth's finding on this point.

Our second reason for rejecting the Counties' argument is that they have not established that the stock clause tax "is fairly related to the services provided by the State [which benefit interstate commerce]." *Fulton,* 516 U.S. at 334, 116 S.Ct. 848. Some of the Counties attempted to show that they provided services which benefited interstate commerce by showing that they provided services which corporations not doing business in Pennsylvania arguably utilized. *See* Interim Report at ¶¶ 7, 12 and 17. However, none of the Counties established to what extent these services were provided to or utilized by corporations not doing business in Pennsylvania. Thus, we are unable to determine whether the tax imposed by the stock clause "is fairly related to the services" provided by the Counties.

Even if, however, we were to find that the Counties met their burden as to the first prong of the compensatory tax test, we would still find that their claim failed as they have not

6. The 1939 amendment was essentially a codification of this Court's decision in *In re Arrott's Estate,* 322 Pa. 367, 185 A. 697 (1936).

met the second prong. The second prong of the compensatory tax test requires that the Counties establish that the tax imposed by the facially discriminatory stock clause roughly approximates, but does not exceed, the amount of the tax burden which the capital stock tax and the franchise tax impose. *Fulton,* 516 U.S. at 332–33, 116 S.Ct. 848.

To meet this burden, the Counties presented the testimony of an expert witness whose background was in economics and public policy. The expert witness testified that in the years 1992–1996, the capital stock and franchise taxes were collected at a rate of 12.75 mills. Of that, 12 mills went into a general fund which was distributed on a state-wide basis, while the remaining .75 mills were specifically allocated to the Lottery Fund and the Hazardous Sites Cleanup Fund.

In 1992, approximately 40.1% of that general fund was distributed to local governments.[7] The expert witness postulated that 40.1% of the capital stock and franchise taxes should thus be viewed as going to local governments. The witness further calculated that approximately 4.8 mills (or 40.1% of 12 mills) of the capital stock and franchise taxes went to local governments in 1992. He then compared that 4.8 mills figure to the 4 mills rate levied by the personal property tax and concluded that the personal property tax roughly approximates, but does not exceed, the amount of the tax burden which the capital stock tax and the franchise tax impose.

We are not persuaded by the expert witness's testimony. First, the witness did not take cognizance of the fact that the money distributed from the general fund to local governments is distributed not only to counties, which may collect the personal property tax, but also to municipalities, townships and school districts, which in general may not collect the personal property tax.[8] It is unclear which portion of the 4.8 mills figure was distributed to the Counties and thus could

7. The percentage of the general fund which went to local governments remained fairly constant throughout the period in question.

8. Apparently, the Pittsburgh School District and the Philadelphia School District at one point collected a personal property tax. N.T., 9/15/98 (morning session) at 68.

possibly be seen as a counterpart to the allegedly compensatory personal property tax, and which portion was distributed to local entities which cannot collect the personal property tax and thus could in no fashion be seen as a counterpart to the personal property tax.

Second, the witness's figures concerning distributions from the general fund included distributions made to every county in this Commonwealth. This is highly problematic for, as noted, not all counties collect the personal property tax. In order to give an accurate representation of whether the taxes collected by the personal property tax are in parity with the portion of the capital stock and franchise taxes the counties receive from the general fund, the witness would have had to calculate how much the counties which collect the personal property tax receive from the general fund, and exclude from his calculations how much the general fund distributes to the counties which do not collect the personal property tax.

Finally, even assuming *arguendo* that the Counties had met the first two of the three prongs, we would nonetheless conclude that they had failed to establish that the stock clause of the personal property tax is a compensatory tax as they have not carried their burden as to the third prong. The third prong of the compensatory tax doctrine requires that "the events on which the interstate and intrastate taxes are imposed must be 'substantially equivalent'; that is, they must be sufficiently similar in substance to serve as mutually exclusive 'prox[ies] for each other.' " *Fulton,* 516 U.S. at 333, 116 S.Ct. 848.

In analyzing this third prong, President Judge Smyth credited the opinion of the Annenbergs' expert witness that the personal property tax is not substantially equivalent to the capital stock and franchise taxes. *See* Interim Report at ¶ 43. In arriving at this conclusion, the witness testified that the personal property tax is based on the value of shares on one day, while the capital stock and franchise taxes are determined by measuring economic flow. Also, the witness noted that the taxes are imposed and utilized by different levels of government. The personal property tax is imposed at the

county level and is utilized for county purposes. The capital stock and franchise taxes, on the other hand, are imposed at the state level and are utilized for state purposes.[9] Thus, President Judge Smyth concluded that the Counties had failed to meet the third prong of the compensatory tax test. We agree with President Judge Smyth on this point and adopt his reasoning.

■ The Counties have failed to carry their burden of establishing that the stock clause of the personal property tax is a compensatory tax. We are thus compelled to find that the portion of the stock clause which excludes from the personal property tax stock held in companies which are subject to the capital stock and franchise taxes is unconstitutional as it violates the Commerce Clause of the United States Constitution.

The next step in our analysis is to determine whether the exclusionary language in the stock clause, the language which renders the stock clause unconstitutional, may be severed. In analyzing this issue, we are keenly aware of the precept that the "public policy of this Commonwealth favors severability." *Commonwealth, Department of Education v. The First School,* 471 Pa. 471, 370 A.2d 702, 705 (Pa.1977).

This Commonwealth's principles of statutory construction declare that

[t]he provisions of every statute shall be severable. If any provision of any statute ... is held invalid, the remainder of the statute ... shall not be affected thereby, unless the

9. As additional support for his conclusion, the witness stated that the incidence of the tax does not fall on the same class of taxpayers. With the personal property tax, it is the shareholder who pays the tax; with the capital stock and franchise taxes, it is the corporation itself which pays the tax. The Counties contest this conclusion, however, arguing that this Court in *In re Arrott's Estate,* held that there is a "unity of interest" between a stockholder and the corporation such that a tax paid by the corporation is seen as being paid by the stockholder. Thus, the Counties conclude that these three taxes do fall on the same class of taxpayer.

Even if we were to assume *arguendo* that the Counties' interpretation of *In re Arrott's Estate* is correct, the taxes are still dissimilar enough in nature so that the third prong of the *Fulton* analysis cannot be met.

court finds that the valid provisions of the statute are so essentially and inseparably connected with, and so depend upon, the void provision or application, that it cannot be presumed the General Assembly would have enacted the remaining valid provisions without the void one; or unless the court finds that the remaining valid provisions, standing alone, are incomplete and incapable of being executed in accordance with the legislative intent.

1 Pa.C.S. § 1925.[10]

In addressing this issue, President Judge Smyth determined that the unconstitutional portion of the statute, which excluded from the tax stock held in companies which were subject to the capital stock and franchise taxes, could indeed be severed. The Annenbergs, however, contest this, arguing in essence that the passage of time has altered the severability analysis, and claim that the personal property tax on stock must be stricken in its entirety. In support of their argument, they point to the fact that the legislature has recently rejected a proposed bill which included a provision which would have extended the personal property tax to all classes of stock. Amendments to Senate Bill No. 2, 11/18/1996, A–7450, Printer's No. 2328. The Annenbergs claim that when the legislature rejected this proposed bill, it sent the clear message that it did not desire the stock clause of the personal property tax to apply to all classes of stock. They contend that were this Court to sever the statute so that the personal property tax would apply to all classes of stock, we would be altering the contours of the personal property tax in a fashion which the legislature specifically rejected three years ago. They con-

10. In general, provisions of the Statutory Construction Act, 1 Pa.C.S. § 1501 et seq., cannot be applied to statutes enacted prior to 1937. 1 Pa.C.S. § 1502(a)(1)(i). There is an exception to that general rule, however, which states that where the Statutory Construction Act merely codified existing statutory construction law, then those particular provisions of the Statutory Construction Act shall be applied to statutes enacted prior to 1937. 1 Pa.C.S. § 1502(b).

The principles of severability as set forth in 1 Pa.C.S. § 1925 are clearly a restatement of the law as it existed prior to 1937. See Com. ex rel. Woodruff v. Humphrey, 288 Pa. 280, 136 A. 213, 216 (1927); Rothermel v. Meyerle, 136 Pa. 250, 20 A. 583 (1890). Thus, pursuant to 1 Pa.C.S. § 1502(b), we shall apply 1 Pa.C.S. § 1925 to this matter.

clude by stating that in doing so, we would be thwarting the demonstrated intent of a contemporary legislative body and would thus be overstepping the powers allotted to us to sever statutes.

The Annenbergs' argument fails for two reasons. First, as noted by the Intervenor–Counties, only a miniscule portion of the rejected bill concerned the stock clause of the personal property tax. Thus, in the absence of any evidence from the legislative history which would establish that the bill was voted down because of the expansion of the scope of the stock clause, it cannot necessarily be inferred that the current legislature would be opposed to severing the void portions of this statute.

Second, and far more importantly, the Annenbergs' argument is inapt as it requests that we focus not on the intent of the legislature which enacted the void provision of this statute, but rather on the intent that can possibly be inferred from the rejection of a bill by a legislative body more than one hundred years after the statute was enacted. We find such an analysis not in accord with our rules of statutory construction. 1 Pa.C.S. § 1925 demands that we sever the void provision of the statute unless "it cannot be presumed the General Assembly would have enacted the remaining valid provisions without the void. one. . . ." Clearly, Section 1925 funnels our inquiry to examining what the enacting legislature would have done had it known that the exemption it placed in the stock clause was unconstitutional. The statute does not, as the Annenbergs would have us interpret it, instruct us to examine what subsequent legislatures would have intended vis-a-vis the personal property tax. Thus, we reject the Annenbergs' argument on this point.

Next, the Annenbergs argue that were we to sever the void provision from the stock clause, thereby expanding the stock clause to encompass classes of stock which had previously eluded the tax, we would be violating the separation of powers doctrine as the power to tax lies solely with the legislature. We reject this contention. When this Court severs a void provision from a statute, it is doing so to attempt to effectuate

legislative intent. We are therefore not arrogating to ourselves the power to tax but rather are attempting to determine how the legislature would have exercised its taxing power had it known, in 1889, that the exclusion was void.

The Annenbergs' final contention regarding severability is that the unconstitutional portion of the stock clause is an exclusion rather than an exemption; from this point, the Annenbergs apparently argue that this Court can never sever an unconstitutional exclusion from a taxing statute. Whether the phrase in question is deemed an exemption or an exclusion, the severability analysis is unaffected.[11] Regardless of how the void provision is classified, our task is to determine whether the legislature would have enacted the remainder of the statute without the void portion had it known that the void portion was unconstitutional. There is no rule of statutory construction which forbids us from severing void exclusions. Furthermore, such a narrow and arbitrary rule would be most peculiar in light of the strong public policy favoring severability.

For the foregoing reasons, we reject the Annenbergs' arguments against severability and sever the exclusion. The net effect of this severance is that stock which had previously escaped the personal property tax due to the fact that the companies in which that stock was held owed either the corporate stock or franchise taxes will now be subject to the personal property tax.

■ Having determined that the void provision is severable, we turn to the question of what retrospective remedy, if any, is due to the Annenbergs. At the outset, however, we must dispose of the claim made by the Intervenor–Counties that we cannot address this issue as the Annenbergs requested only

---

11. As noted by the Intervenor–Counties, there appears to be only one legal distinction between an exclusion and an exemption: an exclusion is to be construed against the taxing authority while an exemption is to be construed against the taxpayer. *Ernest Renda Constructing Co., Inc. v. Commonwealth*, 516 Pa. 325, 532 A.2d 416, 420 (1987); *Deigendesch v. County of Bucks*, 505 Pa. 555, 482 A.2d 228, 232 (1984). Such a distinction, however, has no impact on this severability analysis.

declaratory and injunctive relief, and did not request any form of monetary relief in their Petitions for Review.

We find that the Intervenor–Counties' interpretation of the Annenbergs' Petitions for Review and of our concomitant power to award relief is exceedingly narrow. Where plaintiffs make a general prayer for relief,

the court may grant any appropriate relief that conforms to the case made by the pleadings although it is not exactly the relief which has been asked for by the special prayer.... Under the prayer for general relief, the plaintiffs are entitled to such relief as is agreeable to the case made in the bill, though different from the specific relief prayed for.

*Lower Frederick Township v. Clemmer*, 518 Pa. 313, 543 A.2d 502, 512 (1988) (quoting *Meth v. Meth*, 360 Pa. 623, 62 A.2d 848, 849 (1949)).

In the Annenbergs' Petitions for Review filed with this Court, they requested that we award the "relief sought in their Petition[s] for Review ... filed with the Commonwealth Court on March 27, 1996...." *Annenberg* Petition for Review, filed on 1/03/1997 and docketed at 003 Misc. Dkt.1997, at 2; *Annenberg* Petition for Review, filed on 1/03/1997 and docketed at 004 Misc. Dkt.1997, at 2. In their Petitions for Review filed with the Commonwealth Court, the Annenbergs made a general prayer for relief. *Annenberg* Petition for Review, filed on 3/27/1996 and docketed at No. 343 M.D.1996, at 9; *Annenberg* Petition for Review, filed on 3/27/1996 and docketed at No. 344 M.D.1996, at 11. Clearly, although not specifically requested, addressing the issue of whether monetary relief is warranted in this matter, where the constitutionality of a taxing provision is challenged, would be within our power. *See Lower Frederick Township.*

Furthermore, addressing this issue would be consistent with our oft-stated principle that we "liberally construe" our civil and appellate procedure rules in order to achieve the interests of justice in an expeditious fashion. *Peters Creek Sanitary Authority v. Welch*, 545 Pa. 309, 681 A.2d 167, 170 (1996) (citing Pa.R.C.P. 126); Pa.R.A.P. 105. It is undisputed that

the Annenbergs squarely challenged the constitutionality of the stock clause and have properly filed claims for refunds with the Board of Assessment Appeals. Clearly, if we do not review at this juncture what relief is due to the Annenbergs, we shall most likely be compelled to review this issue later after the Board of Assessment Appeals is left to grapple with it without any direction from this Court.

The Intervenor–Counties also argue that if the remedy issue is to be addressed, we should not decide it at this juncture but rather should send the matter back to President Judge Smyth to hold another hearing on this issue. We find such a course of action unnecessary. Unlike the compensatory tax issue, a complicated factual issue for which a hearing was required, this issue is purely legal. The parties have fully briefed this issue; we see no need to delay judgment by ordering yet another hearing be held.

Now we turn to the substance of this issue. President Judge Smyth in his Interim Report concluded that

[s]ince the exclusions are unconstitutional, leaving a valid tax, [the Counties] should be permitted to retain and collect the personal property tax on stock that is not subject to the capital stock or franchise taxes. On the other hand, taxpayers and counties planned their fiscal affairs based on the assumption that stock subject to the capital stock and franchise taxes were not taxable under the personal property tax. [The Counties] should not be allowed to collect tax retroactively on what was believed to be exempt. Since the tax base will be expanded, [the Counties] may wish to exercise their option to impose the tax, if they impose it at all, at a lower rate. Therefore collection of the personal property tax on stock that was formerly not taxed should operate prospectively only, following the adoption of new tax resolutions or ordinances.

Interim Report at 26. The net effect of President Judge Smyth's recommendation would be that the status quo for prior taxing years would be maintained: the tax which had been previously collected would be retained by the Counties, but the tax would not be retroactively collected on stock held

in companies which had been subject to the capital stock or franchise tax. Furthermore, the expanded tax which resulted from severing the void provision from the stock clause would apply only to future tax years.

The United States Supreme Court was confronted with a nearly identical situation in *McKesson v. Division of Alcoholic Beverages and Tobacco, Dept. of Business Regulation of Florida,* 496 U.S. 18, 110 S.Ct. 2238, 110 L.Ed.2d 17 (1990). In *McKesson,* the Florida Supreme Court held that a taxing provision which favored in-state products violated the Commerce Clause. The Florida Supreme Court, however, declared that its ruling would be purely prospective only and the taxpayers would not be entitled to a retrospective remedy.

The United States Supreme Court held that this was error, stating that the "State [must] provide meaningful backward-looking relief to rectify any unconstitutional deprivation." *Id.* at 31, 110 S.Ct. 2238. The Supreme Court noted that the Due Process Clause of the Fourteenth Amendment compelled such a duty and required that the State fashion a backwards looking remedy whereby those who had paid the tax were put in the same position as those taxpayers who had been favored by the unlawful exemption. *Id.* at 43, 110 S.Ct. 2238. The Court, however, did not bind the state's hands in choosing what type of backward looking remedy it would employ. Rather, the Court held that State could cure the invalidity by: (1) refunding the difference between the tax paid and the tax that would have been assessed had the taxpayer been granted the unlawful exemption; (2) assessing and collecting back taxes, to the extent consistent with other constitutional restrictions,[12] from those who benefited from the unlawful ex-

---

**12.** Regarding these "other constitutional restrictions," the United States Supreme Court stated:

We previously have held that the retroactive assessment of a tax increase does not necessarily deny due process to those whose taxes are increased, though beyond some temporal point the retroactive imposition of a significant tax burden may be "so harsh and oppressive as to transgress the constitutional limitation," depending on "the nature of the tax and the circumstances in which it is laid." *Welch v. Henry,* 305 U.S. 134, 147, 59 S.Ct. 121, 83 L.Ed. 87 (1938). See *United States v. Hemme,* 476 U.S. 558, 106 S.Ct. 2071, 90 L.Ed.2d

emption during the contested tax period, calibrating the retro-active assessment to create in hindsight a nondiscriminatory scheme; or (3) applying a combination of a partial refund and a partial retroactive assessment, so long as the resultant tax actually assessed during the contested tax period reflects a scheme that does not discriminate against interstate commerce. *Id.* at 40–41, 110 S.Ct. 2238.

■ Our review of *McKesson* makes it clear that the United States Constitution dictates that some retroactive remedy is due here so that the prior unconstitutional discrimination is rectified. The Counties, however, contend that we are not so constrained. Rather, they claim that we do indeed have the power to decide whether the determination that the stock clause is unconstitutional will apply retroactively only, thus denying the Annenbergs a retrospective remedy. In support of this argument, they cite this Court's decision in *American Trucking Associations, Inc. v. McNulty*, 528 Pa. 212, 596 A.2d 784 (1991).

*McNulty* was the last case in a series of cases, from both this and the United States Supreme Court, which concerned the constitutionality of highway use taxes. In *American Trucking Associations, Inc. v. Scheiner*, 483 U.S. 266, 107 S.Ct. 2829, 97 L.Ed.2d 226 (1987), the United States Supreme Court reversed the judgment of this Court, *see American Trucking Associations, Inc. v. Scheiner*, 510 Pa. 430, 509 A.2d 838 (1986), and held that certain highway use taxes violated the Commerce Clause. The *Scheiner* Court then remanded the matter to this Court "to consider whether [the] ruling

538 (1986); *United States v. Darusmont*, 449 U.S. 292, 101 S.Ct. 549, 66 L.Ed.2d 513 (1981); cf. *United States v. Sperry Corp.*, 493 U.S. 52, 65, 110 S.Ct. 387, 107 L.Ed.2d 290 (1989) ("It is surely proper for congress to legislate retrospectively to ensure that costs of a program are borne by the entire class of persons that Congress rationally believes should bear them"); *Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 15, 96 S.Ct. 2882, 49 L.Ed.2d 752 (1976) ("Legislation readjusting rights and burdens is not unlawful solely because it upsets the otherwise settled expectations. This is true even though the effect of the legislation is to impose a new duty or liability based on past acts") (citations omitted).
496 U.S. at 40 n.23, 110 S.Ct. 2238.

should be applied retroactively and to decide other remedial issues." *Scheiner*, 483 U.S. at 297, 107 S.Ct. 2829.[13]

After the *McNulty* matter was remanded to this Court, the United States Supreme Court granted certiorari in *American Trucking Associations, Inc. v. Smith*, 496 U.S. 167, 110 S.Ct. 2323, 110 L.Ed.2d 148 (1990), to address the question of whether the *Scheiner* decision should be applied retroactively. We held our decision in the remanded *McNulty* matter pending the United States Supreme Court's decision in *Smith*.

The United States Supreme Court in *Smith* was unable to come to a consensus and issued a plurality opinion. The *Smith* Court plurality determined that state courts were not compelled to apply *Scheiner* retroactively. In reaching this conclusion, it applied the three factor test annunciated by the United States Supreme Court in *Chevron Oil Co. v. Huson*, 404 U.S. 97, 92 S.Ct. 349, 30 L.Ed.2d 296 (1971).[14]

Once the *Smith* plurality opinion was issued, this Court held in *McNulty* that retrospective relief in the form of a refund was not warranted. In making this determination, we relied on the plurality opinion in *Smith*. The Counties would have us apply our decision in the matter *sub judice* prospectively only in reliance on our *McNulty* decision.

In presenting this argument, however, the Counties have failed to take cognizance of the fact that there has been a change in the law of retroactivity since the *Smith* plurality issued its opinion. Subsequent to *Smith*, the Supreme Court overruled *Chevron Oil* insofar as it permitted a court to

13. The *Scheiner* matter was recaptioned after remand to this Court from the United States Supreme Court as James I. Scheiner, Secretary of the Department of Revenue, was replaced in his position by Eileen McNulty. Pursuant to Pa.R.A.P. 502(c), the case was recaptioned *American Trucking Associations v. McNulty*.

14. For decades, the *Chevron Oil* test was the accepted standard, in federal courts as well as many state courts, for determining whether a decision was to be applied retroactively. The three part test states that a court may opt for a decision to have purely prospective effect where: (1) the decision establishes a new principle of law; (2) retroactivity would not further, and could perhaps retard, application of the new rule; and (3) retroactive application could produce substantial inequitable results.

determine selectively whether it would apply a new rule of law prospectively only. *Harper v. Virginia Dept. of Taxation,* 509 U.S. 86, 97, 113 S.Ct. 2510, 125 L.Ed.2d 74 (1993); *Reynoldsville Casket Co. v. Hyde,* 514 U.S. 749, 751–53, 115 S.Ct. 1745, 131 L.Ed.2d 820 (1995). The Court stated that where the "court applies a rule of federal law to the parties before it, that rule is the controlling interpretation of federal law and must be given full retroactive effect in all cases still open on direct review and as to all events, regardless of whether such events predate or postdate our announcement of the rule." *Harper,* 509 U.S. at 97, 113 S.Ct. 2510. As the rule announced in the United States Supreme Court's decision in *Fulton* controls this matter and there is no question that the Supreme Court applied *Fulton* to the parties before it, pursuant to *Harper,* we, too, must apply the *Fulton* rule retroactively.

The Counties, however, argue that decisions of the United States Supreme Court on retroactivity are not controlling, but are merely persuasive as this Court has stated that such issues are "squarely within the province of the state courts," *Blackwell v. State Ethics Comm'n,* 527 Pa. 172, 589 A.2d 1094, 1098 (1991). This analysis is incorrect. Where the legal question involved is a federal one, the United States Supreme Court has quite plainly decreed that the federal doctrine of retroactivity cannot be circumscribed by the state courts. The United States Supreme Court has stated that "[t]he Supremacy Clause, U.S. Const., Art. VI, cl. 2, does not allow federal retroactivity doctrine to be supplanted by the invocation of a contrary approach to retroactivity under state law. Whatever freedom state courts may enjoy to limit the retroactive operation of their own interpretations of state law ... cannot extend to their interpretations of federal law." *Harper,* 509 U.S. at 86, 100, 113 S.Ct. 2510 (citations omitted). This matter involves the Commerce Clause of the United States Constitution, which is clearly an issue of federal law. Thus, we are compelled to apply the *Harper* rule of retroactivity.

Although the United States Supreme Court has crafted a broad range of remedies permissible under the United States

Constitution, *see supra,* the Annenbergs argue that once this Court has determined that as a matter of constitutional law they are entitled to a remedy, then statutory law dictates that only one type of remedy is allowed: the money that they had paid pursuant to the discriminatory stock clause of the personal property tax must be immediately tendered to them, plus any statutory interest which is owed. In support of this argument, the Annenbergs cite to 72 P.S. § 5566b. Section 5566b, in relevant part, reads as follows:

> § 5566b. Refund of taxes, etc., to which political subdivision is not legally entitled; interest
>
> (a) Whenever any person or corporation of this Commonwealth has paid or caused to be paid, or hereafter pays or causes to be paid, into the treasury of any political subdivision, directly or indirectly, voluntarily or under protest, any taxes of any sort, license fees, penalties, fines or any other moneys *to which the political subdivision is not legally entitled;* then, in such cases, the proper authorities of the political subdivision, upon the filing with them of a written and verified claim for the refund of the payment, are hereby directed to make, out of budget appropriations of public funds, refund of such taxes, license fees, penalties, fines or other moneys to which the political subdivision is not legally entitled. Refunds of said moneys shall not be made, unless a written claim therefor is filed, with the political subdivision involved, within three years of payment thereof.

72 P.S. § 5566b(a) (emphasis supplied). In its simplest terms, Section 5566b provides a mechanism for the refund of taxes "to which the political subdivision is not legally entitled."

■ However, Section 5566b is inapplicable to this case. We have not concluded that the Counties are not legally entitled to levy a personal property tax on corporate stock holdings. Rather, we have determined that in levying a personal property tax on corporate stock holdings, the Counties are not legally entitled to grant the exemption contained in 72 P.S. § 4821 to stock in corporations which have a taxable nexus with Pennsylvania because doing so discriminates against interstate commerce in violation of the Commerce

Clause. By severing the exclusionary language in the stock clause which renders the stock clause unconstitutional, we have left intact the Counties' ability to levy a personal property tax on corporate stock holdings generally.

The tax levied by Montgomery County on the Annenbergs' corporate stock holdings constituted a tax to which Montgomery County *was legally entitled.* It was the granting of the exemption limited to the Annenbergs' stock in corporations which have a taxable nexus with Pennsylvania which constituted the illegal act by Montgomery County. Since 72 P.S. § 5566b limits its mandated refund to taxes which a political subdivision is not legally entitled, it is inapplicable to a case such as this. Montgomery County has *not* levied a tax to which it was not legally entitled, but has instead *granted an illegal exemption* from a tax to which it was legally entitled.[15] Section 5566b does not therefore limit the broad range of remedies permissible under the United States Constitution to the refund of taxes collected by the Counties.

In sum, we hold that the stock clause is not a compensatory tax and the portion of the stock clause which excludes from the personal property tax stock held in companies which are subject to the capital stock and franchise taxes is therefore

15. In making the argument that our discretion in fashioning a suitable remedy is limited by Section 5566b, the dissent implies that it is improper, upon concluding that a portion of a taxing scheme is unconstitutional, to allow the taxing authority to keep the taxes previously levied and collect back taxes from those who benefited from the unconstitutional portion. In doing so, the dissent suggests that the United States Supreme Court countenanced an improper and unlawful remedy in *McKesson.* The final two remedies outlined by the United States Supreme Court in *McKesson* allow the taxing authority to retain the taxes, or a portion thereof, previously levied under an unconstitutional taxing scheme as long as back taxes are collected from those who benefited from the unlawful exemption, so as to "create in hindsight a nondiscriminatory scheme." The dissent's conclusion implies that the United States Supreme Court sanctioned a remedy in *McKesson* which would allow the state of Florida to retain taxes which it was not entitled to as a matter of law. We find it quite unlikely that the United States Supreme Court committed such a glaring oversight. Rather, the choice of remedies provided by the United State Supreme Court in *McKesson* ensures that the tax which is actually imposed "does not deprive [the taxpayer] of tax moneys in a manner that discriminates against interstate commerce." *McKesson,* 496 U.S. at 42, 110 S.Ct. 2238.

unconstitutional; that the void exclusionary language of the stock clause is severable; and that the Counties must forthwith provide a retrospective remedy consistent with this opinion.

Jurisdiction is relinquished.

Justice CAPPY files a concurring and dissenting opinion in which Justice NIGRO joins.

CAPPY, Justice, concurring and dissenting.

I agree with the Majority that the Counties have failed to carry their burden of showing that the stock clause of the personal property tax is a compensatory tax and that the stock clause therefore violates the Commerce Clause of the United States Constitution.[1] Furthermore, I agree that the exemption should be severed. I cannot, however, agree with the Majority's conclusion as to what remedy is due; I therefore respectfully dissent as to that portion of the Majority's opinion.

As noted by the Majority, the Annenbergs argue that once this court has determined that constitutional law mandates that they are entitled to a remedy for the unconstitutional collection of this tax, then statutory law dictates that only one type of remedy is allowed: a refund. In support of this argument, the Annenbergs cite to 72 P.S. § 5566b, a statute which dictates that when a governmental entity has collected a tax to which it "is not legally entitled," it shall provide a "refund of such taxes" to the taxpayer.

The Majority, however, rejects this argument. Instead, it notes that the United States Supreme Court's decision in *McKesson v. Division of Alcoholic Beverages and Tobacco, Dept. of Business Regulation of Florida*, 496 U.S. 18, 31, 110 S.Ct. 2238, 110 L.Ed.2d 17 (1990) did not mandate that a refund must always issue whenever it is determined that a tax has been unconstitutionally collected, but rather allowed the State great leeway in fashioning a backward-looking remedy. The Majority contends that this court, in fashioning a remedy

1. U.S. Const. art. I, § 8, cl. 3.

in the matters *sub judice,* has that myriad of options available to it; it posits that our discretion is not circumscribed by the legislature's pronouncement that the only remedy for an illegally collected tax is a refund to the taxpayer. Rather, the Majority stridently contends that the dictates of 72 P.S. § 5566b do not apply here because "Montgomery County has *not* levied a tax to which it was not legally entitled, but has instead *granted an illegal exemption* from a tax to which it was legally entitled." Majority op. at 352 (emphasis in the original).

I believe that the reasoning espoused by the Majority is internally inconsistent. First, the Majority finds that the stock clause violates the Commerce Clause. The Counties' collection of the personal property tax on stock held by taxpayers in out-of-state entities was therefore unconstitutional. And yet, the Majority paradoxically proceeds to hold that the Counties were nonetheless legally entitled to collect this tax, and the provisions of 72 P.S. § 5566b therefore do not apply. With all due respect, I simply cannot fathom how the Majority can logically conclude both that a tax was unconstitutionally collected and that the Counties were legally entitled to collect that very same tax.

The legislature has plainly stated that where a tax has been collected to which the government entity "is not legally entitled," then the taxpayer shall be given a refund.[2] In my opinion, a tax which was unconstitutionally collected is without question one to which the governmental entity was "not legally entitled." Thus, I believe the only remedy available in the matters *sub judice* is the one mandated by 72 P.S. § 5566b: a refund. As I am not persuaded by the Majority's attempt to

**2.** I believe that the statutory requirement of providing a "refund" could be met in at least two fashions. One way would be to provide an immediate, lump sum payment of money. Another way of satisfying the dictates of 72 P.S. § 5566b would be to allow the Counties to compensate the affected taxpayers by granting them a credit equal to the amount of taxes illegally collected pursuant to the discriminatory stock clause. This credit could be utilized to offset any taxes owed by that taxpayer to the county, whether those taxes be owed pursuant to the stock clause of the personal property tax or any other tax.

608

avoid this apparently unpalatable conclusion, I must respectfully dissent from this portion of the majority opinion.

Justice NIGRO joins this concurring and dissenting opinion.