**[J-59 B-2013]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**EASTERN DISTRICT**

| | |
|---|---|
| IN RE: PHILADELPHIA TRAFFIC COURT JUDGE CHRISTINE SOLOMON | : No. 62 EM 2013<br>:<br>: Petition of the Judicial Conduct Board to<br>: Stop, Suspend or Stay Proceedings on the<br>: Rule to Show Cause or, in the Alternative,<br>: for Permission to Appear, Participate and<br>: Be Heard at Any Proceedings before the<br>: Appointed Master<br>:<br>:<br>:<br>: ARGUED: September 10, 2013 |

**DISSENTING STATEMENT**

**MR. CHIEF JUSTICE CASTILLE**                    **FILED: December 19, 2014**

The Court today discharges its rule to show cause entered upon the Honorable Christine Solomon, Judge of the Philadelphia Traffic Court, and vacates this Court's related *per curiam* orders of May 21 and July 12, 2013. Today's order does not specifically address the petition of the Judicial Conduct Board (the "JCB" or "Board"), which is technically the matter at issue on appeal; however, the Court's disposition of the underlying orders issued upon Judge Solomon essentially renders the JCB petition moot. For the reasons that follow, I cannot join the *per curiam* disposition. In my view, it is vital that the Court retains responsibility to the Pennsylvania Constitution to vindicate its authority over the Unified Judicial System.

By way of background, Judge Christine Solomon was elected to the Philadelphia Traffic Court bench in November 2011, and began hearing cases in March 2012.[1] Her

---

[1] Judge Solomon's term ends on December 31, 2017. PA. CONST. art. V, § 15(a)). The General Assembly has amended Title 42 to provide that the composition of the (continued...)

election coincided with the turmoil generated by the federal investigation and indictment of nine Philadelphia Traffic Court judges on felony charges predicated upon allegations that judges of that court and others engaged in *ex parte* communications and gave preferential treatment to certain ticketholders, "most commonly by 'fixing' tickets for those with whom they were politically and socially connected." See U.S. v. Sullivan, 2013 WL 3305217 (E.D. Pa. 2013). Having taken the bench after the federal crimes charged occurred, Judge Solomon, of course, was not among the indicted jurists.

However, the federal investigation prompted the First Judicial District (the "FJD") -- acting upon authority delegated by this Court -- to commence review of Traffic Court operations. See 42 Pa.C.S. §§ 1701, 1721, & 102 (Supreme Court may delegate administrative authority to any court or other officer of Unified Judicial System). The immediate goal of the review was to secure and preserve evidence, to facilitate full cooperation with the federal investigation, and to reestablish the probity of Traffic Court operations. The administrative review was to be supervised by the newly appointed Administrative Judge of the Traffic Court, the Honorable Gary S. Glazer, Judge of the Philadelphia County Court of Common Pleas. This Court, via correspondence this author sent as liaison Justice to the FJD, informed the President Judge of Traffic Court, then-Judge Thomasine Tynes, of the expanded mandate of the FJD and that the full cooperation of all Traffic Court personnel was expected.

As an aspect of the review, Judge Glazer and the FJD's consultant, Chadwick Associates, conducted interviews with Traffic Court employees and judges, including

---

(…continued)
Philadelphia Traffic Court is limited to "two judges: (1) who are serving on the court on the effective date of this subsection; and (2) whose terms expire on December 31, 2017." 42 Pa.C.S. § 1321. Section 1321 thus specifically addresses the tenures of the last two elected Traffic Court Judges: Judge Solomon and Judge Michael J. Sullivan.

Judge Solomon. The subsequent report prepared by Chadwick Associates ("FJD Report") alleged that Judge Solomon had refused to cooperate with the administrative review, by failing to respond or by failing to respond forthrightly to questions.

On April 18, 2013, premised upon the conclusions of the FJD Report, the Court entered upon Judge Solomon a Rule to Show Cause why Judge Solomon "should not be subject to a suspension from her judicial duties without pay for a period of ninety (90) days based upon her refusal to cooperate with the [Supreme] Court-ordered administrative review of the Traffic Court." The rule was returnable on April 29, 2013. On April 24, 2013, Judge Solomon answered the Rule to Show Cause, challenging the conclusions of the FJD Report. On May 21, 2013, upon review of Judge Solomon's answer, this Court appointed the Honorable William H. Platt, Senior Judge of the Superior Court of Pennsylvania, to serve as the Court's Master, and directed Judge Platt to "gather necessary factual information and consider pertinent legal questions," and to "forward his Report and Recommendations, detailing proposed findings of fact and conclusions of law, as soon as practicable." The Administrative Office of Pennsylvania Courts was instructed to attend any hearings and participate as necessary. See In re Solomon, 66 A.3d 764 (Pa. 2013) (*per curiam*). Judge Solomon asked the JCB to participate.

In June 2013, Judge Solomon and the JCB ("petitioners") filed an application which, in relevant part, challenged the authority and jurisdiction of this Court to enter the rule to show cause upon Judge Solomon. According to petitioners, such authority was reposed exclusively in the Court of Judicial Discipline (the "CJD"). The JCB also represented that it was pursuing an investigation of Judge Solomon in light of the FJD Report, even though such an investigation by the Board presumably is confidential. The Court permitted the JCB to participate and, in October 2014, the Court resolved the

broad constitutional claims raised by petitioners in the companion case implicating Judge Mark A. Bruno. In re Bruno, 101 A.3d 635 (Pa. 2014).

In Bruno, the Court held that the supervisory and administrative authority articulated in Section 10(a) of Article V of the Pennsylvania Constitution is a legacy aspect of the Court's King's Bench authority, which persists as a legal predicate for gathering information via a special master and, upon review of the master's recommendations, for any additional actions by our Court, including the suspension of a sitting jurist. Employing the King's Bench authority is discretionary and, in cases of judicial misconduct for which Article V, Section 18 provides a disciplinary mechanism, the exercise of discretion is appropriate only in extraordinary circumstances. The separate Bruno matter focused largely upon the residual role of the Court in a case in which a sitting jurist is charged with felonious offenses (in Bruno, relating to conduct on the bench), a circumstance that raises the prospect of an interim suspension pending resolution of the criminal charges. Interim suspensions are addressed expressly by Article V, Section 18 of the Pennsylvania Constitution and squarely implicate the competing authority of the CJD. See PA. CONST. art. V, § 18(d). By contrast, the central issue in dispute involving Judge Solomon is whether an inquiry into a jurist's compliance with administrative directives from this Court (here, relating to cooperation with the FJD's efforts to reform the Philadelphia Traffic Court) is a task best undertaken by this Court's Special Master, or whether the Court should defer to the judicial disciplinary mechanism of the JCB and the CJD.

This case obviously raises concerns for this Court that are distinct from those in Bruno. Solomon originated purely from the exercise by this Court of its constitutional administrative and supervisory responsibilities. Judge Solomon's alleged failure to respond, or to respond forthrightly, to court-appointed interviewers whose task was

recommending reform measures in light of evidence of pervasive corruption in the very court upon which she sat -- if proven -- would be an apparent "unjustified defiance" of this Court's express delegated authority to conduct a review of Traffic Court operations. See In re Assignment of Avellino, 690 A.2d 1138, 1143-44 (Pa. 1997) ("Avellino I") (footnote omitted). A factual inquiry by this Court, via a special master, into Judge Solomon's conduct is a logical extension of the administrative review already conducted by the FJD. Whether disciplinary action by the JCB or the CJD was also appropriate is a separate matter. See Bruno, 101 A.3d at 686-87.

The JCB's petition revealed that it was investigating Judge Solomon; but for that representation, forwarded to the Court only because of the Rule to Show Cause we issued upon the jurist, we would have no knowledge whether the Board was investigating Judge Solomon for her alleged refusal to cooperate. It appears that, while this matter was pending, and unbeknownst to the Court, the JCB and Judge Solomon have settled the judicial disciplinary issue arising under Article V, Section 18 of the Constitution. Thus, on December 5, 2014, the Board and Judge Solomon filed a post-submission communication informing the Court that, Judge Solomon having waived the confidentiality that would otherwise apply to JCB proceedings, the Board's investigation has "concluded" and has "resulted in a dismissal of the complaint filed in relation to Judge Solomon, with a Letter of Caution," which is "a private warning of judicial misconduct." The post-submission communication does not detail the precise nature of the complaint the Board actually pursued and what its findings were; from the judicial disciplinary point of view, the matter will remain confidential, as mandated by Article V, Section 18(a)(8) ("All proceedings of the board shall be confidential except when the subject of the investigation waives confidentiality.").

In light of the conclusion of the JCB investigation, the Court today vacates our order appointing Judge Platt and discharges the rule to show cause issued upon Judge Solomon, thereby ending the case as an administrative matter. In my view, the notion that the Court must, or even should, defer to the investigation and outcome of the judicial disciplinary apparatus in a case involving whether a member of the minor judiciary has defied this Court's administrative directive is misguided. We do not know, for example, if the JCB found as fact that Judge Solomon did not defy our authority; or, if the Board instead found that she did defy the Court but, in the Board's estimation, such defiance was excusable or *de minimus*. Or, it could be that, given the JCB's limited resources, resolution by agreement seemed to be the best resolution. Indeed, we do not even know the standard by which the Board measures defiance, assuming Judge Solomon's alleged defiance was the focus of the Board's endeavor. I think the Court, and the public, have a right to know precisely what happened in this instance, and the confidential process and outcome resolving the judicial disciplinary matter here is insufficient. I cast no aspersions on the Board's action in this matter; it has a different constitutional charge and responsibility. But, I do believe the situation here demonstrates the unforeseen consequences arising from the amendment to Article V, Section 18(a)(8) of the Constitution.[2]

---

[2] This author is not the first to recognize the difficulties inherent in the task of the JCB, as presently constituted. In its recommendations respecting judicial discipline, the Interbranch Commission on Juvenile Justice stated, in relevant part:

> 2. Long term recommendations:
>
> With regard to the long term recommendations, the commission has come to two inescapable conclusions: (1) the Judicial Conduct Board lacks sufficient oversight to assure that it is fulfilling its constitutional duties and obligations; and (2) the existing confidentiality provisions relating to the

(continued...)

(...continued)

work of the Judicial Conduct Board prohibit any meaningful oversight and accountability.

In order to effectuate the needed reforms to the Judicial Conduct Board, the commission recommends the creation of a group, perhaps similar to the composition of the Beck Commission, to conduct a constitutional review and study to determine what changes are necessary to assure oversight and accountability of the Judicial Conduct Board. In particular, the commission emphasizes the following areas for review:

a. The appointment process for board members and the general board composition;

b. The powers and duties of the board;

c. Determination if the general rules governing the conduct of its members are adequate to discharge the members' constitutional mandate and if they are being adequately implemented;

d. The creation of an appellate mechanism to the Court of Judicial Discipline for review of the Judicial Conduct Board's decision to dismiss a complaint;

e. A careful review and revision of Article V, Section 18(a)(8) as it relates to confidentiality and accountability of the Judicial Conduct Board in fulfilling its constitutional obligations;

f. The creation of an outside administrator and record keeper. Such an administrator would be bound by the confidentiality standards mandated for the board and would, therefore, have access to details about complaints and their handling. The administrator would then be in a position to audit the board's specific performance. When warranted, the administrator could promptly question the failure to address complaints, or why investigations were allowed to languish.

(continued...)

Furthermore, the Court has confronted similar situations in the past and has acted to vindicate the authority of the Court and to assure the proper functioning of the judicial system. See, e.g., In re Assignment of McFalls, 795 A.2d 367, 373 (Pa. 2002) (common pleas judge failed to comply with judicial assignment; Court imposed thirty-day suspension without pay as "proper response" to jurist's defiance and, additionally, referred matter to JCB); In re Avellino, 690 A.2d 1144, 1145-46 (Pa. 1997) ("Avellino II") (judicial officer refused to comply with assignment to preside over criminal trials in "felony-waiver program" of court of common pleas; three-month suspension without pay appropriate remedial sanction). This is not a typical case of alleged judicial misconduct. To the extent Bruno applies at all -- except to reaffirm our authority -- the circumstances of Judge Solomon's alleged resistance to the FJD's reform efforts, and by extension her supposed defiance of the legitimate authority delegated by this Court, if proven, are certainly "extraordinary" and require, in my opinion, further action to vindicate our authority.

Given the nature of the JCB resolution, any information gathered by the Board will remain confidential and the Court has no opportunity to make a reasoned decision whether its administrative authority has been vindicated. If our historical and constitutional powers of supervision are to be effective, when affronts to our authority occur, such as that alleged here of Judge Solomon, it is essential, at a minimum, to develop a factual record of the matter which would be available to this Court. In this vein, I reiterate the observation of the Justices of the Court in 1862 on its King's Bench

---

(…continued)
Interbranch Commission on Juvenile Justice, Report, at 45 (May 2010), available online at www.pacourts.us/Links/Public/InterbranchCommissionJuvenileJustice.htm (last visited December 16, 2014).

power, which is equally applicable in this context: because the Court's authority "is a trust for the people of Pennsylvania, judges have no right, from motives of ease and convenience, to surrender, weaken, or obscure, by judicial refinements, one single one of the powers granted." Chase v. Miller, 41 Pa. 403, 411 (Pa. 1862).

In light of these considerations, my preference remains to continue the proceedings before Judge Platt as outlined in our April 18, 2013, Order. This resolution has the advantage of allowing the Court access to information necessary to determine whether any action, including imposition of our own administrative sanction, is appropriate. See Annenberg v. Commonwealth, 757 A.2d 338 (Pa. 2000) (review of master's findings and recommendations is de novo where Court exercised and did not relinquish plenary jurisdiction; although findings are not binding upon this Court, they are afforded due consideration).

I respectfully dissent.