# IN THE SUPREME COURT OF PENNSYLVANIA
## EASTERN DISTRICT

IN RE:  CONFLICT OF INTEREST OF THE
OFFICE OF THE PHILADELPHIA
DISTRICT ATTORNEY,

PETITION OF:  MAUREEN FAULKNER,
WIDOW OF DECEASED POLICE OFFICER
DANIEL FAULKNER

:  No. 125 EM 2019
:
:
:
:
:
:
:
:
:

## CONCURRING STATEMENT

**JUSTICE WECHT**                                       **FILED:  December 16, 2020**

The present controversy centers upon claims by a murder victim's widow that an elected prosecutor is litigating the case in a duty-defying, defendant-friendly way.  To advance these claims, Maureen Faulkner sought our rarely-deployed King's Bench jurisdiction.  Following due consideration, we chose to invoke that power in a limited fashion.  We decided that, under these exceptional circumstances, it was most prudent to appoint a special master for purposes of a proper inquiry.  The Honorable John M. Cleland once again answered this Court's call, shouldering a substantial burden, and doing so in an expeditious and meticulous way.  Judge Cleland conducted detailed fact-finding proceedings and arguments, soldiering on remotely as the COVID-19 pandemic raged and impeded ordinary court operations.  It is difficult to find a similar set of circumstances in our Court's long history.

Nonetheless, despite these and other idiosyncratic features, this case, for purposes of resolution, is just like any other case.  As in countless other disputes, there have been allegations, responses, petitions, discovery, depositions, submission of evidence, testimony, fact-finding, rulings, exceptions, and advocacy.  All that we must do now is apply our appellate rules and decide the case.  In cases predicated upon the

exercise of our King's Bench jurisdiction, we must afford "due consideration" to supported factual findings, to which we then apply a *de novo* standard of review. *Annenberg v. Commonwealth*, 757 A.2d 338, 342-43 (Pa. 2000). When that is done here, the outcome becomes obvious. The petitioner, Maureen Faulkner, did not prove her claims, and so we must dismiss her petition. Thus, I join today's order.

It is not unreasonable to characterize this as one of the most famous criminal cases in Pennsylvania history. In the almost forty years since Mumia Abu-Jamal's 1981 murder of Philadelphia Police Officer Daniel Faulkner, the case has generated impassioned debate. The merits of Abu-Jamal's murder conviction are not before this Court today. Nor are the facts underlying that conviction.

What is important here are Ms. Faulkner's claims that, since the election of Lawrence Krasner as District Attorney of Philadelphia, that office (the "DAO") has been conflicted, has not litigated the case with due vigor, and must be replaced by the Office of the Attorney General of Pennsylvania (the "OAG").

In 2016, Abu-Jamal filed a facially untimely Post Conviction Relief Act ("PCRA"),[1] seeking relief based upon the United States Supreme Court's decision in *Williams v. Pennsylvania*, ___ U.S. ___, 136 S.Ct. 1899 (2016). The DAO, by that point led by DA Krasner, argued that Abu-Jamal was not entitled to relief. The PCRA court nonetheless ruled in favor of Abu-Jamal, restoring his appellate rights in connection with several prior appellate and post-conviction proceedings. The DAO did not appeal the ruling, and Abu-Jamal proceeded to file a consolidated notice of appeal in the Superior Court.

While that appeal was pending before the Superior Court, DA Krasner found boxes of files related to Abu-Jamal's case that had not been provided to Abu-Jamal. Upon review of those files, Abu-Jamal's attorneys located a letter that they believed gave rise

---

[1]     42 Pa.C.S. §§ 9541-46.

to a claim that a key Commonwealth witness may have been compensated for his testimony against Abu-Jamal. Abu-Jamal asked the Superior Court to remand his appeal to the PCRA court for consideration of the newly-discovered evidence. At that time, the DAO did not contact the trial prosecutor to investigate the letter or the claim. Instead, while taking no position on the merits of the issue or on the question of whether relief was due, the DAO decided not to oppose the remand request.

The DAO's decision not to appeal the PCRA court's ruling, and its decision not to oppose the remand, caused Ms. Faulkner to believe that the DAO was not defending Abu-Jamal's conviction with sufficient vigor, and prompted her to seek the DAO's removal. As Ms. Faulkner was not a party to the case, she filed a petition to intervene in the pending appeal. The Superior Court ultimately denied Ms. Faulkner's petition.

Ms. Faulkner then filed the King's Bench petition that is at issue here. Her belief that the DAO must be removed from the case rests upon several allegations that are undeniably troubling. Among those claims, Ms. Faulkner maintained that, by consenting to the remand of Abu-Jamal's appeal without at least speaking with the trial prosecutor, the DAO effectively refused to perform its duty to defend Abu-Jamal's conviction on appeal. Ms. Faulkner also addressed the personal and professional conduct of DAO employees that she insisted created conflicts of interests that prevented the DAO from advancing the Commonwealth's interests. First, she asserted that DA Krasner was personally biased in favor of Abu-Jamal based upon DA Krasner's statement that certain former DAO prosecutors were "war criminals." Ms. Faulkner also noted that DA Krasner at one time had been a member of the National Lawyers Guild, an organization that represented protesters in 2000, some of whom had expressed support for Abu-Jamal. Second, Ms. Faulkner highlighted distasteful social media posts from a DAO spokesperson, and also asserted that Jody Dodd, DA Krasner's assistant, was an active

member of a pro-Abu-Jamal organization. Finally, Ms. Faulkner contended that, because Assistant Supervisor of the DAO's Law Division, Paul George, Esquire, had once signed a brief that criticized Abu-Jamal's conviction, ADA George's employment at the DAO compromised that office's ability objectively to litigate Abu-Jamal's appeals and PCRA proceedings. Ms. Faulkner contended that the conflict permeated the entire Law Division, and that ADA George could not adequately be screened off from the case.

Ms. Faulkner maintained overall that the DAO could not litigate the case in a fair and unbiased manner. She implored this Court to invoke our King's Bench jurisdiction, and to direct the OAG to take the case over from the DAO. This was an extraordinary request, and we concluded that a factual inquiry into the extraordinary allegations raised by Ms. Faulkner was warranted. Recognizing that this Court is ill-equipped to take evidence and find facts, we invoked our King's Bench jurisdiction and appointed Judge Cleland as special master. We directed him to "determine if the [DAO's] participation in the underlying criminal case . . . presents the appearance of a conflict of interest such as to impede the fair and impartial administration of justice." Order, 3/3/2020, at 1. We conferred upon Judge Cleland substantial discretion over the proceedings, requiring only that he consider the claims that Ms. Faulkner raised in her petition to this Court and that he complete his task by June 1, 2020.

By any yardstick, Judge Cleland performed his duty with thoroughness, diligence, and skill. Judge Cleland focused the issues, guided the discovery and submission of evidence, and oversaw depositions and live (albeit remote, in view of the pandemic) testimony. Thereafter, Judge Cleland submitted a Report to this Court setting forth his factual and legal findings. In his Report, Judge Cleland determined that, based upon the evidence and testimony submitted, Ms. Faulkner "failed to establish the existence of a direct conflict of interest which compromises the ability of [District Attorney Krasner] or

his assistants and staff to carry out the duties of his office." Report, 6/17/2020, at 1-2. Not only did Judge Cleland discern no actual conflict of interest; he concluded as well that Ms. Faulkner failed to establish "an appearance of impropriety that would compromise a reasonable person's confidence in the capacity" of the DAO to litigate Abu-Jamal's case. *Id.* at 2.

Judge Cleland recognized that the fulcrum of Ms. Faulkner's petition was the procedural decision-making that the DAO made recently in Abu-Jamal's criminal case: to wit, (1) the decision not to appeal the PCRA court's award of relief based upon *Williams*; and (2) the decision not to oppose Abu-Jamal's petition for remand after the DAO uncovered new evidence and made it available to the defense. To evaluate the nature and circumstances of these decisions, Judge Cleland

> interviewed, under oath, every person directly referenced in the King's Bench Petition as having some involvement in litigating the underlying PCRA matter and also reviewed their depositions, taken under oath. Some of those referenced testified that they had no involvement in the case. All witnesses having a role in the PCRA dispute, however, stated that it is their intention to defend the conviction, and that they are aware of no evidence that would support or justify a decision to the contrary or to concede any PCRA relief. In addition, [Judge Cleland] specifically questioned those people directly involved in making [the two key] decisions criticized in the King's Bench Petition.

*Id.* Based upon this evidence, and his attendant credibility determinations and findings of fact, Judge Cleland concluded that the DAO's decisions "rest[ed] on reasonable legal and strategic foundations." *Id.* Further, Judge Cleland emphasized that "no evidence has been presented that supports a finding that the District Attorney or his assistants do not intend to defend the conviction." *Id.*

In explaining his decisions, Judge Cleland focused upon nine "essential allegations." A brief review of each follows.

First, Judge Cleland evaluated Ms. Faulkner's assertion that the DAO had no reasonable justification for electing not to oppose Abu-Jamal's petition for remand. Two ADAs addressed the reasoning behind the DAO's concession, which Judge Cleland quoted at length in his Report. ADA Tracey Kavanaugh explained that, when she was made aware of the newly-discovered materials, particularly the letter pertaining to the alleged payment to a material witness, she believed that a hearing likely would be required to ultimately resolve the issue. She had spoken to ADA McGill before the materials were uncovered and noted that he was getting older. In fact, he was in his late seventies. She knew that his testimony would be necessary at a hearing, and believed that, due to his advanced age, delaying the proceedings by insisting on interviewing him before the case was remanded could jeopardize the opportunity to get him on the witness stand and under oath. In short, she consented to the remand to expedite the matter to ensure that ADA McGill would be alive to testify.

ADA Nancy Winkelman testified that there also was a procedural concern underlying the decision to agree to the remand. She believed that, if the newly-discovered evidence claim had merit (and it seemed to), the claim would have to await the end of the pending proceedings before it could move forward. That would mean having to litigate a sixth PCRA petition and any subsequent appeals. ADA Winkelman believed that it made more sense to stay the appeal and to take action on the new claim, for purposes of expediency and conservation of resources.

DA Krasner echoed ADA Winkelman's concern about how long the litigation would take if Abu-Jamal had to file yet another PCRA petition. He testified that it was "extremely concerning" that, after the pending appeal was concluded, the parties would have to return to the PCRA court for more fact-finding and more litigation, which could last another "three to five years." *Id.* at 13. DA Krasner wanted to integrate the issue into the pending

proceedings, obtain any necessary factual determinations, and then litigate any ruling as part of the pending appeal before the appellate court.

Judge Cleland, implicitly crediting the testimony of these prosecutors, found that the DAO's decision to agree to a remand did not "lack merit," and that it was "arguably appropriate." *Id.* at 13 n.8. The judge found it pertinent that there had to be a factual determination to discern whether the material was, in fact, newly discovered, and, because the appeal was pending, the PCRA court lacked jurisdiction to make that finding. A remand was the only option to allow that fact-finding, and was "[i]n the interest of moving the case as expeditiously as possible" instead of forcing the issue to be addressed on "another, and long-delayed, day." *Id.* at 13. Thus, Judge Cleland found the DAO's decision to be reasonable.

Second, Judge Cleland addressed Ms. Faulkner's claim that the DAO at least should have interviewed ADA McGill, the trial prosecutor, before agreeing to a remand. Again, the judge relied upon ADA Kavanaugh's testimony. She explained that, if McGill, who at the time was in his late seventies, became incapacitated, there would be no evidence to dispute Abu-Jamal's claim for a new trial. ADA Kavanaugh knew ADA McGill to be a fair prosecutor with a good reputation, so she did not believe that he agreed to pay a witness. Having no such doubts, she found no immediate need to interview ADA McGill, particularly considering her concern that his age could compromise his availability at a future hearing.

ADA Kavanaugh also explained that, at the time, there was a critical ruling that emanated from Philadelphia that she interpreted as prohibiting a prosecutor from interviewing attorneys in PCRA matters.[2] In an abundance of caution, and to avoid

---

[2] *See Commonwealth v. King*, 212 A.3d 507 (Pa. 2019). In *King,* we upheld the PCRA court's ruling preventing the prosecutor from interviewing defense counsel who had refused to be interviewed by the PCRA petitioner. Our decision was based upon the

violating the perceived rule, ADA Kavanaugh elected not to proceed in a piecemeal fashion, instead intending to conduct a full interview at a later date.

Judge Cleland, again implicitly accepting ADA Kavanaugh's testimony as credible, found that in "a high-profile case such as this, it cannot be disputed that an abundance of caution would be warranted." *Id.* at 14. The ruling in *King*, Judge Cleland opined, reasonably would cause any prosecutor to be "justifiably hesitant" before interviewing witnesses without court permission. *Id.* at 14-15.

Third, Judge Cleland turned to Ms. Faulkner's claim that ADA George permanently was conflicted based upon his prior involvement as an attorney for Abu-Jamal, as well as her assertion that no amount of screening could eliminate what was at the least an appearance of impropriety. It was not disputed that ADA George signed a brief for Abu-Jamal in 2007. However, Judge Cleland noted, ADA George testified that he merely signed the brief as local counsel, and that he had never met or spoken with Abu-Jamal. He conducted no legal research or analysis for the brief. Nor did he draft any part of the filing. ADA George explained that, by signing the brief, he was not agreeing with anything stated therein regarding the propriety of Abu-Jamal's conviction. His signature indicated only that he agreed that an evidentiary hearing was justified. Otherwise, ADA George had never advocated for, supported, or spoken on behalf of Abu-Jamal.

When hired as the supervisor of the Law Division, ADA George spoke with ADA Winkelman about the need to be screened off from Abu-Jamal's case. ADA George discussed the procedure with an ethics professional at the DAO, and has been walled off from the case. He receives no information about the case and does not discuss it with anyone. Judge Cleland pointed out that DA Krasner, ADA Winkelman, ADA Kavanaugh,

---

unique circumstances of that case. Our ruling in *King* does not in any way prevent prosecutors from interviewing *any* witnesses in PCRA proceedings, including fellow prosecutors.

and ADA Grady Gervino all testified consistently that ADA George has been blocked entirely from participation in the case.

ADA Gervino pointed out that ADA George's employment by the DAO has not changed the DAO's position on Abu-Jamal's conviction. ADA Gervino explained that he has been an attorney with the DAO since 1995, and has worked on the responses to Abu-Jamal's appeals. He testified that the DAO's arguments regarding the case since the time that DA Krasner and ADA George joined the DAO have remained consistent with those advanced prior to their arrival. ADA Gervino emphasized that, over the decades, his defense of the conviction has been "vigorous" and that he had not been approached by anyone about how to litigate the case. He has "written the brief like I would any other brief in any other case." *Id.* at 18 (citation to notes of testimony omitted).

On this record, Judge Cleland found no evidence establishing a conflict of interest. And he found no cracks in the wall separating ADA George from the DAO's work on Abu-Jamal's case.

Next, Judge Cleland evaluated Ms. Faulkner's claims that Jody Dodd was a well-known supporter of Abu-Jamal and that Dodd's employment with the DAO evinces an appearance of impropriety. When Dodd and DA Krasner worked in the private sector, they both interacted with entities that directly or indirectly intersected with Abu-Jamal's cause. However, Judge Cleland concluded that, aside from some flyers that listed DA Krasner and Dodd as persons that protesters could contact for legal assistance in connection with the 2000 Republican National Convention (flyers that were circulated some twenty years earlier), "there is no evidence supporting an argument that Dodd has participated in any meaningful way in efforts to support Abu-Jamal or that could be deemed to undermine the efforts of the DAO to uphold his conviction." *Id.* at 19-20. Judge Cleland also noted that Dodd has played no role in the PCRA litigation: "[s]he is not an

attorney, and there is no evidence that she has discussed the case with any of the attorneys involved on behalf of the DAO." *Id.* at 20.

Next, Judge Cleland addressed Ms. Faulkner's contentions that two individuals intimately associated with the DAO and DA Krasner created a pro-Abu-Jamal atmosphere in the DAO that gave rise to an incurable conflict of interest. Those individuals are Patricia McKinney, Esquire, a criminal defense attorney who DA Krasner hired as a DAO supervisor, and Michael Coard, an attorney who espoused controversial views about policing and prosecuting crime and who served on DA Krasner's transition team after DA Krasner won election. DA Krasner testified that he had never spoken to McKinney about Abu-Jamal, and that he had never expressed any doubts to her about Abu-Jamal's conviction. In endorsing Krasner for District Attorney in 2017, Coard had stated: "everything I support Larry Krasner supports." *Id.* at 20. In view of this, Judge Cleland asked DA Krasner specifically if he told Coard that Abu-Jamal's conviction was improper or should be overturned. DA Krasner testified "no." Ms. Faulkner offered no evidence to rebut this testimony, which Judge Cleland proceeded to credit.

Judge Cleland found no actual conflicts of interests regarding McKinney and Coard, concluding that Ms. Faulkner's claim that DA Krasner's relations with them posed an appearance of impropriety was "simply not persuasive." *Id.* at 20. To the extent that ADA George's prior work indicated support for Abu-Jamal, that engagement occurred some thirteen ago, and "Coard's endorsement, in the midst of a political campaign that generated multiple endorsements, is simply too tenuous to raise the concern of an impropriety." *Id.* at 20-21

Ms. Faulkner further alleged that DA Krasner's representation of individuals some twenty years ago who supported Abu-Jamal and were arrested for protesting the 2000 Republican National Convention, and his involvement with the National Lawyers Guild

(which listed Abu-Jamal as a member of its Board of Directors), created a conflict of interest. Judge Cleland deemed this argument "somewhat obscure." *Id.* at 21. At the hearing, Ms. Faulkner's counsel maintained that membership in the same organization as Abu-Jamal sufficed to give rise to a conflict. In response, DA Krasner stated that he never paid dues to the National Lawyers Guild.

Judge Cleland again found the connections too tenuous to sustain Ms. Faulkner's claim. "Even if [DA] Krasner was a member of a large national professional organization, mere association with the organization, or one of its directors, is hardly proof of a conflict of interest." *Id.* Judge Cleland also held that DA Krasner's professional representation of individuals arrested during protests "does not identify him with the causes for which the clients were protesting." *Id.*

Next, Judge Cleland assessed the claim that DA Krasner's alleged pro-Abu-Jamal mindset affected the litigation of the case on behalf of the Commonwealth. In his Report, Judge Cleland quoted an exchange between him and DA Krasner, during which the judge pointedly asked DA Krasner if he believed Abu-Jamal was guilty. DA Krasner stated, "Sir, in my opinion based upon all the facts in law [*sic*] that I have is that he is guilty." *Id.* at 22 (citation to notes of testimony omitted). Judge Cleland then asked if DA Krasner had "any personal doubts" about Abu-Jamal's conviction, to which DA Krasner responded: "No. Based on all the facts in law [*sic*] known to me, no, I do not." *Id.*

Judge Cleland observed that "District Attorney Krasner and his assistants have followed the same strategy and defended the case in the same manner as prosecutors before him have done for 30 years." *Id.* Judge Cleland noted that the testimony of DA Krasner and ADAs Kavanaugh, Winkelman, Gervino and Goode was "consistent" in this regard. *Id.*

Finally, Judge Cleland weighed the cumulative effect of DA Krasner's past political and professional activities, and examined whether those activities in the aggregate could lead to a reasonable question as to DA Krasner's ability to litigate this case in an unbiased manner on behalf of the Commonwealth. Judge Cleland observed: "It is, of course, beyond dispute that Krasner, as a so-called progressive prosecutor, is in some quarters a polarizing figure in a polarized political environment." *Id.* at 23. DA Krasner's role requires him to make decisions that give rise to criticism, debate, and concern: "If one were to judge him based on the cumulative effect of criticism from his detractors, one might have an understandable concern about his devotion to prosecutorial priorities." *Id.* Nonetheless, Judge Cleland emphasized, his focus, as we directed, was upon "one special case:" Abu-Jamal's. *Id.* "A perception based on the arguments of detractors cannot overcome the actual and undisputed fact that [Ms. Faulkner] has presented no evidence that [DA] Krasner or his assistants have not defended the conviction of Mumia Abu-Jamal or do not intend to do so in the future." *Id.* Judge Cleland concluded: "no credible argument has been made that [DA] Krasner and his assistants have adopted legal positions or legal strategies that do not have arguable merit or are not supported in law based on the facts." *Id.*

Judge Cleland acknowledged that, in "unusual circumstances," removal of a conflicted prosecutor "may be appropriate." *Id.* To obtain that extraordinary remedy, "the burden should be on the objector to support such a course by presenting more than predictions based on suspicions." *Id.* Ms. Faulkner did not do so. Thus, Judge Cleland recommended that her King's Bench petition be denied.

And so the case has returned to this Court. Our analysis is straightforward, the result inescapable. We apply the settled standards of review, and we rule upon Ms. Faulkner's pending King's Bench petition. Those standards are familiar. A fact-finder

may believe all, part, or none of the testimony or evidence, and is tasked with evaluating the credibility of the witnesses. As noted, while we are not ineluctably bound to or by Judge Cleland's fact-findings, we must give them "due consideration." *Annenberg*, 757 A.2d a 343. In my view, there is no valid or compelling reason in this case to ignore Judge Cleland's findings, as he was, after all, in the best position to view the witnesses and make credibility findings.

This Court correctly dismisses Ms. Faulkner's petition. On the record before us, the law affords us no other choice. Judge Cleland's factual findings are supported by the record, and each of his recommendations that derived from those findings is reasonable and correct based upon the evidentiary record. As required by law, Judge Cleland placed the burden upon Ms. Faulkner, as petitioner, to demonstrate the necessity of the DAO's removal. On the record developed, he then determined that she failed to satisfy that burden. Judge Cleland emphasized Ms. Faulkner's failure to present evidence that would support her allegations or would undermine the credible testimony of the relevant witnesses. A record such as this properly allows for only one outcome: dismissal of the petition. The facts, as found by Judge Cleland, permit no other result as a matter of law.

The dearth of evidence in the record to support Ms. Faulkner's allegations does not deter my learned colleague, Justice Dougherty, with whose perspective I respectfully disagree. Justice Dougherty elects to forego the requirement that we afford supported factual findings "due consideration," *see Annenberg,* 757 A.2d a 343, and chooses instead to ignore those findings and reach his own conclusions. Notwithstanding the broad prerogatives attendant to our review at King's Bench, this approach strikes me here as unwise and in any event unavailing. It is axiomatic that we afford due consideration to fact-finders, because "the jurist who presided over the hearings was in the best position

to determine the facts." *Id.* I see no reason not to give Judge Cleland's findings their due consideration.

To be sure, I share some of Justice Dougherty's concerns, particularly regarding DA Krasner's profoundly outrageous and deeply offensive use of the term "war criminals" in reference to some former prosecutors.[3] However, my personal feelings about a party's actions are irrelevant to my role in resolving a particular case. As in all cases that come before us, our duty requires us to put our individual beliefs aside, and to evaluate legal claims according to the applicable standard of review and based upon the factual and procedural record submitted to the Court.[4] The fact that we, like others, might take personal offense to DA Krasner's statements cannot play a role in our adjudicative function.

When Ms. Faulkner filed her initial petition here, it was filled with allegations. Mere allegations can be troubling, and can sometimes provoke courts to take extraordinary actions. Indeed, here, Ms. Faulkner's allegations alone sufficed to warrant a temporary invocation of our King's Bench jurisdiction and to provide her with a rare opportunity to prove her claims to a fact-finder. I fully supported our decision to afford her that chance. However, when given the opportunity to provide evidence that would elevate her allegations into actionable legal claims, Ms. Faulkner failed. Judge Cleland simply found no evidence to support her claims.

---

[3]     I note as well that the beyond-the-pale nature of DA Krasner's slur was aggravated further by DA Krasner's apparent statement that these "war criminals" had fled to "Paraguay," a hateful suggestion that served to liken the OAG to a country that harbored Nazi war criminals following World War II. *See* Chris Brennan, *Philly DA Larry Krasner Clashes with Pa. AG Josh Shapiro — Again — Over Alleged Power Grab*, Philadelphia Inquirer (Aug. 9, 2019); Benjamin Lerner, *By Publicizing Distasteful "Office Joke," DA Larry Krasner Crossed an Ethical Line*, Philadelphia Inquirer (Aug. 14, 2019).

[4]     Those aggrieved by DA Krasner's statements or actions may seek recourse in disciplinary fora or in the political realm that boils and bubbles entirely outside the world of this Court.

Thus, Ms. Faulkner's claims currently stand in the same posture as when they were initiated. They were allegations then, and, for an appellate court's purposes, they remain allegations now. They were not proven.

Although it appears that Justice Dougherty has concurred (albeit reluctantly) in today's judgment, he chooses not to afford Judge Cleland's findings and the established evidentiary record their "due consideration". Where the record contains no proof, Justice Dougherty discerns what he calls "a colorable showing." Conc. Stmt. at 13. Where Judge Cleland found "[n]o credible argument," Report, 6/17/2020, at 23, that the DAO adopted legal positions that undermine its duty to defend Abu-Jamal's conviction, Justice Dougherty finds "questionable" legal strategies. Conc. Stmt. At 14. Where the record demonstrates that Ms. Faulkner failed to "establish the existence of a direct conflict of interest . . . or the appearance of an impropriety," Report, 6/17/2020, at 1-2, Justice Dougherty insists that Ms. Faulkner "has identified a number of circumstances that strongly suggest a less blatant conflict of interest does in fact exist." Conc. Stmt. at 13.

The flaw in Justice Dougherty's conclusions is that they have no more evidentiary support than Ms. Faulkner's initial claims. For instance, Justice Dougherty "questions" the DAO's decision to decline to appeal the PCRA court's decision restoring Abu-Jamal's appellate rights based upon *Williams*. Justice Dougherty is troubled by the fact that the DAO has never explained its reason for this decision Not only did Judge Cleland find that the DAO has not deviated from that office's overall strategy for decades, but there is no proof in the record that the DAO possessed some improper motive for choosing not to appeal. In fact, the credited evidence suggests no ill-intent in the way that the DAO has handled the case.

Justice Dougherty also finds the DAO's concession to a remand while Abu-Jamal's appeal was pending to be "questionable." *Id.* at 14. To support his belief that the DAO's

decision concerning remand points toward a pro-Abu-Jamal litigation strategy, Justice Dougherty asserts that the remand may have contravened the appropriate procedure when newly-discovered evidence is uncovered while a case is on appeal. Justice Dougherty finds it "disconcerting" that a prosecutor could ever agree to a course of action that may not fit within that procedure. Notably, as referenced above, each of the prosecutors that participated in the decision explained the multi-faceted reasoning behind the decision. Justice Dougherty selects one line from DA Krasner's deposition, one not repeated or credited by Judge Cleland in his factual findings, and ignores entirely the credited statements of ADA Kavanaugh and ADA Winkelman, as well as Judge Cleland's conclusion that the DAO's approach was a reasonable strategic decision based upon the circumstances presented to those prosecutors.

Justice Dougherty then turns to DA Krasner's statement that certain prosecutors are "war criminals." As noted, I share Justice Dougherty's view that DA Krasner's statement is "highly offensive." *Id.* at 16. It is indeed that, and more. My personal feelings, however, are not at all relevant to the task at hand, nor can they be a substitute for the absence of record evidence.

Next, Justice Dougherty focuses upon ADA George's role in this matter, who Justice Dougherty believes cannot be screened off adequately from Abu-Jamal's case so as to eliminate any appearance of impropriety. Judge Cleland examined this issue closely, evaluated the testimony and depositions, implicitly made the necessary fact-finding, and concluded that ADA George had been adequately walled-off from the case. Judge Cleland found "no evidence that [ADA George] has been involved in making or influencing any legal or strategic decisions." Report, 6/17/2020, at 15.

In reaching this conclusion, Judge Cleland highlighted numerous statements and assurances made by ADA George during his actual testimony. Judge Cleland also noted

that ADA George worked in tandem with the DAO's ethics officer to ensure that no conflict of interest presented itself. ADA George consistently explained that he is not involved in Abu-Jamal's case in any way. Judge Cleland specifically found that ADA George's exclusion from the litigation of the case was confirmed and corroborated by undisputed testimony from DA Krasner and ADAs Winkelman, Kavanaugh, and Gervino.

Justice Dougherty disregards all of this evidence, and instead proceeds to scour the record in a quest for evidence that ADA George in fact was not adequately being screened from the case. The resulting "evidence" does not undermine Judge Cleland's ruling. For instance, Justice Dougherty cites ADA George's statement in his deposition that "from time to time" Abu-Jamal's case would come up in office conversation. Conc. Stmt. at 16. As Justice Dougherty notes, ADA George explained that, when this happened, he "immediately" removed himself from any participation in the conversation. *Id.* Inadvertent references to Abu-Jamal may be unavoidable, and may occur within ADA George's earshot. That does not mean that the DAO has not adequately screened him from the case. Rather, ADA George's immediate removal from the situation demonstrates that a wall has been erected and that he respects it. There is no evidence to the contrary. And it is evidence that Ms. Faulkner was called upon to present.

To prove the existence of a conflict nonetheless, Justice Dougherty seizes upon what ADA George does not know. ADA George admitted in a deposition that he did not know how many lawyers in the DAO knew about the wall separating him from Abu-Jamal's case. In live testimony, ADA George stated that he did not know if anyone else was making sure the wall was maintained, that there was no formal writing establishing the screening protocol, and that no one ever told him what procedures were most effective to protect the barrier.

Judge Cleland was acutely aware of all of this information and more. Judge Cleland made the relevant credibility findings, and found that a wall had been established and was effective. These conclusions and derivative recommendations are supported by the record. We should not disregard them.

Despite our obligation to afford the fact-finder's conclusions "due consideration," and despite recognizing that all of the DAO prosecutors who are actually litigating the case "uniformly" testified that they did not speak of it to ADA George, and despite admitting that Judge Cleland had "no reason to doubt" these assurances, Justice Dougherty still insists that the record "reveals legitimate reasons" to believe that the screening process has been "inadequate." Conc. Stmt. at 17. Justice Dougherty also finds "substantial force" in Ms. Faulkner's claim that no amount of screening would suffice to remove any alleged conflict of interest. When considered together, and in conjunction with other alleged instances of the DAO's purported "dereliction of duty" that are not before us and were not before Judge Cleland, Justice Dougherty believes that "the circumstances surrounding this case paint a disturbing picture," *id.* at 19, such that "one might easily see why" Ms. Faulkner believes that DA Krasner and his assistants are perhaps not capable of objectively serving the interests of the Commonwealth. *Id.* The problem is that the "disturbing picture" that Justice Dougherty sees is not the one that was painted for the fact-finder in this case. The image that Justice Dougherty perceives rests upon allegations, but not upon any of the facts of this case. Judge Cleland found no facts to support Ms. Faulkner's claims, and we owe that finding "due consideration." It should not be cast aside simply because the *allegations* made in the case are troubling or disturbing. From that empty bucket, Justice Dougherty somehow nonetheless finds paint to compose a "disturbing picture." However vast our authority in cases such as this one is, our standard of review still does not permit such creations.

Ultimately, Justice Dougherty joins the Court's order dismissing Ms. Faulkner's petition, not because the record mandates the result, but because he believes that a recent decision by a special panel of this Court in *Commonwealth v. Reid*, 235 A.3d 1124, 1148 (Pa. 2020) (holding that *Williams* cannot serve as an exception to the PCRA's time limit),[5] effectively will terminate this case on jurisdictional grounds. Perhaps in some future proceeding, a court will have occasion to consider the issue of jurisdiction regarding Abu-Jamal's present appeals. But, here and now, before this Court, we address a King's Bench petition, not Abu-Jamal's underlying criminal case. The reason that the petition is being dismissed has nothing to do with the jurisdictional proprieties of Abu-Jamal's' case. Ms. Faulkner's petition is being dismissed because she raised a litany of allegations, but was unable to prove any of them.

Justice Mundy's dissent fares no better. Like Justice Dougherty, Justice Mundy elects to premise her analysis upon Ms. Faulkner's allegations, ignoring the fact record as it now stands and the decisions that Judge Cleland made based upon that record. As opposed to Justice Dougherty, Justice Mundy would resolve the matter now instead of awaiting a future ruling based upon *Reid*. However, like Justice Dougherty, Justice Mundy makes no serious attempt to explain if, or how, Judge Cleland's fact-finding was undeserving of our "due consideration." *Annenberg*, 757 A.2d a 343. Consequently, Justice Mundy's position fails for the same reasons that undercut the position advanced by Justice Dougherty.

Adhering to our standard of review, there can be only one outcome to this case. Ms. Faulkner has not proven her claims, and we must dismiss her petition. However

---

[5]    In *Reid*, I joined Justice Donohue's compelling dissent as, like her, I believe that *Williams* must apply retroactively to defendants in whose cases former Chief Justice Castille participated as both a prosecutor and a Justice of this Court. *Reid*, 235 A.3d at 1171 (Donohue, J., dissenting).

"grave and alarming," Conc. Stmt. at 22, her allegations may be, they remain just that: allegations.  I join the Court's order.