IN THE COMMONWEALTH COURT OF PENNSYLVANIA

City of Pittsburgh,                      :
                                         :
                    Appellant            :
                                         :
          v.                             : No. 1174 C.D. 2023
                                         : Argued: May 23, 2024
Fraternal Order of Police               :
Fort Pitt Lodge No. 1                    :

BEFORE:    HONORABLE MICHAEL H. WOJCIK, Judge
           HONORABLE MATTHEW S. WOLF, Judge
           HONORABLE BONNIE BRIGANCE LEADBETTER, Senior Judge

OPINION NOT REPORTED

MEMORANDUM OPINION
BY JUDGE WOJCIK                          FILED: January 22, 2025

The City of Pittsburgh (City) appeals from an order of the Court of Common Pleas of Allegheny County (trial court), which upheld the arbitration award issued by Jane Desimone (Arbitrator) in favor of the Fraternal Order of Police, Fort Pitt Lodge No. 1 (FOP). The Arbitrator found that the City overcharged retired police officers for their healthcare subsidies by $257,333.32 and $233,089.78 in 2017 and 2018, respectively, and awarded corresponding reimbursements in the same amounts. On appeal, the City argues that the Arbitrator lacked jurisdiction to award a reimbursement pertaining to the retirees' City-paid subsidy and that the arbitration failed to observe due process. Upon careful review, we affirm.

## I. Background

The Arbitrator summarized the relevant facts of this case as follows:

Going back to the January 1, 2003 - December 31, 2004 collective bargaining agreement [(CBA)], the City

provided healthcare coverage at no cost to employees. This changed on December 29, 2003, when the City entered Act 47 protection as a financially distressed local government. Pursuant to the Act 47[1] Plan, a minimum of 15% employee contribution for healthcare was mandated. At the beginning of the January 1, 2005 - December 31, 2009 [CBA], the City was self-insured for healthcare benefits. This self-insurance continued until January 1, 2008, at which time the City returned to a fully insured contract of insurance. This fully insured status then continued until January 1, 2016, at which time the City returned to self-insurance, which has remained to the present. The City remained fully insured for vision and dental insurance.

Along with this history is a record of contractual language and interpretations. When rates were adjusted in 2007, the [FOP] challenged the calculation of the new rates via the grievance procedure. In an Award dated March 22, 2007, Arbitrator Michael Zobrak sustained the grievance, determining what the City could and could not include in calculating employee contribution rates. Thereafter, the City retained the right to choose between full and self-insured options. In an agreement dated February 17, 2010, Section 14.B.l.1 of the Working Agreement was amended to add the following language[]:

> The City has the right to purchase fully insured healthcare plans or to self-insure for purposes of health care coverage.

An Interim Health Care Arbitration Award was then issued on December 23, 2011, that included the following provision:

> The [FOP's] health care consultant shall be afforded access to all of the information and data available to the City's health care consultant during the entire process, including but not limited to, claims data for all employees and direct access to

---

[1] Act of July 10, 1987, P.L. 246, *as amended*, 53 P.S. §§11701.101-.712.

> representatives of the current carrier and participating bidding carriers.

> * * *

> Effective January 1, 2016, the City became self-insured for healthcare purposes. The City has remained fully insured for vision and dental benefits, for which the City paid the full cost of the basic plans.

Arbitrator's Decision, 10/5/2018, at 3-4; Reproduced Record (R.R.) at 365a-66a.

Following the expiration of the CBA on December 31, 2014, the City and the FOP were unable to resolve their negotiations culminating in a July 25, 2016 Interest Arbitration Award under Act 111[2] (Miller Award). R.R. at 69a. Regarding active officer insurance, the Miller Award stated:

> Beginning January 1, 2017, Officers shall contribute fifteen percent (15%) of the premium for health insurance, vision care, and the dental plan. Beginning January 1, 2018 and thereafter, Officers shall contribute seventeen and a half percent (17.5%) of the premium for health insurance, vision care and the dental plan. In addition, the following language should be added to the Working Agreement to provide the City with flexibility to respond to market competition and to reduce the overall cost of coverage:

> The City shall have the right to change the existing medical, surgical, and hospitalization insurance plan, which is comparable to the coverage presently provided. The [FOP], however, retains the right to grieve the City's determination that the plan is comparable. . . . .

Arbitrator's Decision, 7/25/16, ¶12; R.R. at 81a. Although the active officers' contribution towards their health insurance functions as a premium, the parties do not refer to it as such. Rather, because the City became self-insured, the parties refer to this contribution as the premium equivalent rate.

---

[2] Act of June 24, 1968, P.L. 237, No. 111, *as amended*, 43 P.S. §§217.1-217.12.

3

Relevant here, the Miller Award also left intact any unchanged provisions of the expired CBA (also referred to as the Working Agreement). As a consequence, Section 14.B.II.9 of the Working Agreement continued to govern retiree health insurance. It provides:

> Any employee who retires after January 1, 2002, provided he or she was hired before January 1, 2005, will be allowed to continue his or her medical insurance coverage for himself/herself and spouses only, through the City. The City shall contribute towards the cost of this husband and wife coverage, for each employee so electing, an amount equal to the amount charged for such insurance by the carrier providing such coverage on the date of his/her retirement. The plan(s) that the City will provide are the same plan choice provided to active employees . . . .

Arbitrator's Decision, 4/21/23, at 3. Thus, since becoming self-insured, the City provides for retirees' health insurance by paying for the retirees' health care but deducting the premium equivalent rate from the year of the retirees' retirement. The parties refer to this obligation toward retirees as the subsidy.

On January 20, 2017, the FOP filed the instant grievance alleging the following:

> In a series of emails sent by [FOP] President Robert Swartzwelder to the City [] and numerous [] City Officials carbon copied (cc'd) on the email[,] President Swartzwelder has requested from the City [] the premium equivalent rates regarding healthcare from its three primary health providers, namely Aetna, Highmark, and UPMC. To date those rates have not been supplied. Furthermore, the [Miller Award] clearly states that Pittsburgh Police Officers are responsible for paying 15% of the premium[s] for Health Care, Vision and Dental Benefits. At a minimum[,] the City has unilaterally imposed inflated rates for both Dental and Vision benefits which exponentially exceed the 15% premium costs for Vision and Dental Benefits. Regarding Health Care

4

premium rates, the City is clearly in violation of the [Miller Award] . . . .

The series of emails sent by President Swartzwelder requesting the premium equivalent and comparable rates between the City's selected health care carriers are dated November 16, 2016, December 8, 2016 and January 16, 2017. To date neither the FOP [n]or President Swartzwelder ha[ve] received the requested information and thus cannot adequately and realistically "compare" existing medical, surgical, and hospitalization information that the City refuses to supply to the [FOP]. The City is in further violation knowing that it unilaterally implemented the proposed new plan without providing the FOP or President Swartzwelder with the requested comparison information in spite of three requested email[s . . .] to do so.

## REMEDY

Immediately cease and desist the Healthcare, Dental, and Vision **premium increases to** Active and **retired FOP members**. **Refund all overpayments beyond the 2016 rates immediately.** Provide the FOP with the equivalency rate determinations as requested, and if an agreement cannot be reached that the rates are accurate and in compliance with [the Miller Award], issue a make[-]whole remedy consistent with the provisions of the [Miller Award].

Arbitrator's Decision, 4/21/2023, at 2-3 (emphasis added). The City and the FOP agreed to bifurcate the issue of active and retired health care contributions and determined to resolve the following issue first: "[W]hether the City violated the Working Agreement when it set the 2017 and 2018 active employee contribution rates for healthcare, dental and vision benefits. If so, what shall the remedy be?" Arbitrator's Decision, 10/5/18, at 2; R.R. at 364a.

Ultimately, the Arbitrator sustained the FOP's grievance after concluding that the City's calculations inflated the premium equivalent rate, which,

5

in turn, inflated the active officers' contributions. The Arbitrator therefore awarded the following:

> The grievance is sustained for the reasons set forth above. The parties are directed to mutually confer to recalculate employee contributions in accordance with this Award. Affected members shall be made whole for all overpayments. **The undersigned shall retain jurisdiction for issues arising in the calculation of employee contributions, the overpayments, as well as for the bifurcated issue as it related to retiree benefits.**

Arbitrator's Decision, 10/5/18, at 11 (emphasis added); R.R. at 373a. Thereafter, the parties entered into a Memorandum of Understanding, providing in part: "The parties recognize that [the Arbitrator] bifurcated the issue surrounding active and retiree health insurance. This agreement addresses active members. **[The Arbitrator] retains jurisdiction to address retiree health insurance.** The parties intend to meet and continue to confer over the next 90[ ]days." Arbitrator's Decision, 4/21/23, at 4 (emphasis added).

Nevertheless, when the Arbitrator began to hold hearings on the issue of the retirees' healthcare coverage, the City began to challenge the jurisdiction of the Arbitrator. On that point, the City believed that the FOP's grievance failed to adequately raise the issue of the retirees' subsidy, that an Interest Arbitration Award effective January 1, 2019, mooted the controversy, and that "a grievance arbitrator retaining jurisdiction for more than four years from the date of the filing seem[ed] procedurally defective." Arbitrator's Decision, 4/21/23, at 9.

Regarding the merits, the FOP argued that the City was calculating a modified subsidy for retiree healthcare by deducting the member contribution paid under the premium equivalent rate from the full cost of the subsidy in contravention of the Working Agreement. *See, e.g.*, Arbitrator's Hearing, Notes of Testimony

6

(N.T.), 11/4/22, at 34-37; R.R. at 27a. In support of this argument, the FOP presented the expert testimony of William Einhorn, Esq. Arbitrator's Decision, 4/21/23, at 6. In effect, the FOP argued that the City "improperly reduced" retirees' subsidy and consequently overcharged retired officers in 2017, 2018, 2019, and 2021. *Id*. at 6, 8. In reaching this conclusion, Einhorn relied on the documentation of Willis Towers Watson, the City's consulting firm. *Id*. The City did not offer any testimony or evidence in order to rebut Einhorn's testimony; the City simply argued that its calculation of retirees' subsidy was in accordance with both the Miller Award and Working Agreement. *Id*. at 9-10.

In her April 21, 2023 decision, the Arbitrator described the issues to be resolved as: "(1) whether the [A]rbitrator has jurisdiction to decide this matter, and (2) whether the City violated the Working Agreement in setting the healthcare premium equivalent and contribution rates for retired police officers. If so, what shall the remedy be?" Arbitrator's Decision, 4/21/23, at 2.

The Arbitrator found that she retained jurisdiction over the claim. She reasoned that the City's argument regarding mootness was "nonsensical," because the issue of overcharging retired officers remained unresolved pending the 2019 interest arbitration award. Arbitrator's Decision, 4/21/23, at 10-12. Additionally, the Arbitrator emphasized the City's continued communications with the FOP, as well as the Memorandum of Understanding's explicit affirmation regarding the retention of her jurisdiction. *Id*. Regarding the merits, the Arbitrator opined:

> With the clear language of Section 14.B.II.9 of the Working Agreement, there is a[] negotiated method for determining eligible retirees' healthcare contribution rate. As stated, the City "shall contribute . . . an amount equal to the amount charged for such insurance by the carrier" at the time of the member's retirement. The October 5, 2018 Award equated the amount charged by the carrier to the

7

premium equivalent rate due to the City being self-insured. There is no contractual language permitting the City to deduct the retiring employee's contribution rate at the time of retirement form the City's contractual contribution. In doing so, the City added language to the Agreement that is not in existence.

*Id*. at 14-15. After limiting the scope of her jurisdiction to the years 2017 and 2018, the Arbitrator awarded retirees the aforementioned reimbursements based upon Einhorn's calculations. *Id*. at 16.

The City thereafter filed a statutory appeal in the trial court. In an order dated September 7, 2023, the trial court denied the City's appeal. Subsequently, in an opinion in support thereof, the trial court reasoned that the Arbitrator had jurisdiction over the controversy and that the Arbitrator's award did not offend due process mandates. In pertinent part, the trial court opined:

> Clearly, the issue of the subsidy is inextricably entwined with the issue of retiree healthcare premiums as raised in the 2017 grievance filed by the [FOP] requesting a refund of overpayments . . . In addition, for active police, the City and FOP conferred and produced the November 2020 Memorandum of Understanding that required the City to reimburse 2017 and 2018 "medical contributions" to be consistent with the FOP's expert analysis. . . . . [T]he fact that premium equivalency rates, recalculated pursuant to the 2018 arbitration award, ended up being undisputed left the City unable to contest that retirees were overcharged . . . . Without the necessary information about the new retiree rates, the FOP based its grievance on the information it had available to it, which was the increased premium. The City cannot attempt to benefit from its own violation of the 2016 Miller Award by turning around and arguing that the grievance was not specific enough in challenging the rate calculation . . . .

Trial Court's Op., 12/13/23, at 5 (record citations omitted).

## II. Issues

On appeal to this Court, the City argues that (1) the Arbitrator's award did not sufficiently address the issue complained of in the FOP's grievance thereby depriving the Arbitrator of jurisdiction; and (2) the Arbitrator's hearing violated due process strictures thereby warranting reversal. We disagree.

## III. Discussion

Preliminarily, "the scope of review applicable to Act 111 grievance arbitration appeals is settled: narrow *certiorari* review, which allows the [C]ourt to inquire into only four areas, obtains." *Town of McCandless v. McCandless Police Officers Association*, 901 A.2d 991, 997 (Pa. 2006). The four areas our inquiry may enter upon include: (1) the jurisdiction of the arbitrator; (2) the regularity of the proceedings; (3) whether the arbitrator exceeded her authority; and (4) whether there has been a deprivation of constitutional rights. *City of Philadelphia v. Fraternal Order of Police, Lodge No. 5*, 768 A.2d 291, 295 (Pa. 2001).

> [I]f the question of arbitrability turns upon a pure question of law or upon the application of law to undisputed facts, appellate review is plenary; but if arbitrability depends upon fact-finding or an interpretation of the CBA, 'the extreme deference standard' governing Act 111 awards controls. In the latter instance the court is bound by the arbitrator's determination, even though it may be manifestly unreasonable.

*Town of McCandless*, 901 A.2d at 995.

### A. Jurisdiction

Regarding the first issue, the City substantially relies on our Supreme Court's decision in *City of Philadelphia*. City's Brief at 18. In line with that decision, the City asserts that an arbitrator's award must actually remedy the

grievance complained of, *i.e.*, it cannot remedy issues outside the scope of the Act 111 grievance. Likewise, the arbitrator may not consider issues being raised for the first time at the hearing. City's Brief at 19 (citing *City of Philadelphia*, 768 A.2d at 296).

The City believes that, here, the FOP's grievance "challenged the accuracy of the premium equivalency rate set by the City for retirees[,]" but only sought a "make-whole" remedy consistent with the Miller Award. City's Brief at 20-21. Although the Miller Award only addressed active officer contributions, the City asserts that the FOP attempted to expand the scope of its grievance to address "the accuracy of the City's calculations of the financial subsidy it provides eligible retirees for healthcare" at the Arbitrator's hearings. City's Brief at 21. In the City's view, the Arbitrator permitted this modification over the City's objection, the plain language of the grievance, and her professional responsibility regarding jurisdiction. *Id*.

In response, the FOP urges this Court to adhere to the "extreme standard of deference" we owe to an arbitrator's decision in Act 111 grievance proceedings. FOP's Brief at 36. Because our scope of review requires narrow *certiorari* in matters such as this, the FOP would simply have us determine that the Arbitrator possessed jurisdiction over the issue of the retirees' subsidy because Act 111 compels arbitration where there is a dispute regarding the bargained-for terms and conditions of employment, such as "compensation, hours, working conditions, retirement, pensions and other benefits . . ." *Id*. at 37 (citing Section 1 of Act 111, 43 P.S. §217.1). In the FOP's view, the instant dispute rationally relates to the "other benefits" – health insurance for both active police officers and retirees– explicitly

10

bargained for in the Working Agreement, thereby conferring jurisdiction on the Arbitrator.

Regarding the City's argument that the grievance did not raise the issue of retirees' subsidy, the FOP concedes that the Miller Award did not alter retirees' health insurance under the Working Agreement. Nevertheless, it argues that the issue of the City-paid subsidy is necessarily tied to the issue of the premium equivalent rate. Further, given the plain language of the grievance, as well as the subsequent discussions and understanding between the parties, the City should have been on notice that the subsidy would be at issue at the arbitration. FOP's Brief at 32. These issues are entwined, because

> the parties' CBA provides that the retiree healthcare costs are tied to the costs of the active employees, and that when the City self-insures, the City sets the rates given a set of parameters. This directly implicated the contribution of officers toward care and the amount the City pays toward care (the subsidy). The [FOP's] grievance protests that the [FOP] needed to know what the costs were, and how the City calculated them, so as to determine if the City was overcharging . . . both the actives *and* retirees.

*Id.* at 46.[3] Moreover, in seeking a remedy consistent with the Miller Award, the FOP contends it is simply seeking an award consistent with the parties' Working Agreement in effect at the time the grievance was filed. In effect, "the Miller Award . . . increased the contribution amount of actives, because it increased the costs of health insurance, and by extension also [a]ffects what the retirees receive as a subsidy, given the existing language of Section 14 [of the Working Agreement]."

---

[3] At this point, it is worth noting that both parties treated the City's argument regarding the distinction between the premium equivalent rate and the subsidy as a pervasive issue in this case and, as such, repeat or advance new arguments regarding the distinction under both the issue of jurisdiction and the issue of due process. For ease of discussion, all of the parties' arguments pertaining to this distinction will be addressed and resolved under the issue of jurisdiction.

11

*Id.* at 48. The FOP rejoins the City's argument that it never consented to determine the issue of retirees' subsidy by directing our attention to the numerous occasions wherein the parties agreed to bifurcate the issue regarding premium equivalency between active officers and retirees. *Id.*

We agree with the FOP. Similarly, contrary to the City's arguments, we believe our Supreme Court's decision in *City of Philadelphia* favors the FOP's position. In *City of Philadelphia*, 768 A.2d at 292-93, the union filed a grievance complaining that its bargaining unit only contained two Staff Inspectors, while the City of Philadelphia (Philadelphia) compensated for this decline in personnel by assigning the Staff Inspectors' duties to Captains without the attendant pay increase. As such, the union complained that "[t]his number represent[ed] a significant reduction in the number of Staff Inspectors over the past few years without the scheduling of the appropriate promotional examinations[,]" and demanded as relief "[t]hat a promotional examination be scheduled immediately for Staff Inspectors. Make whole." *Id.* at 293. After proceeding to arbitration, the union also asked the arbitrator, over Philadelphia's objection, to opine on the issue of an out-of-class pay award for those Captains who were performing Staff Inspector duties without commensurate pay. *Id.* The arbitrator ultimately rejected Philadelphia's argument that the out-of-class pay award was outside of her jurisdiction and awarded, *inter alia*, the requested relief. *Id.* The Court of Common Pleas of Philadelphia County denied Philadelphia's request for relief – as did this Court. *Id.* at 293-94. We reasoned that the union's grievance, which stated that the number of Staff Inspectors had dwindled, "necessarily implied that some officers were performing Staff Inspector duties but not receiving Staff Inspector pay." *Id.* at 294. We believed that

this, taken together with the demand to be made whole, sufficiently conferred jurisdiction upon the arbitrator to opine on the issue. *Id*.

Our Supreme Court reversed in part, however. In reviewing our decision, the Supreme Court employed a two-step analysis. The Court assessed (1) whether the out-of-class pay award was raised by implication; and if not, (2) whether the arbitrator nevertheless possessed jurisdiction over the claim although it was raised on the first day of the hearing. *City of Philadelphia*, 768 A.2d at 294-95.

On that first prong, the High Court observed that the doctrine articulated in *Annenberg v. Commonwealth*, 757 A.2d 338 (Pa. 2000), applied, meaning where the grievant

> tenders a general prayer for relief . . . . [the] tribunal [must] examine[] the complaining party's statement of the harm which allegedly occurred. The tribunal may then award "any appropriate relief that conforms to the case made by the pleadings although it is not exactly the relief which has been asked for by the special prayer."

*City of Philadelphia*, 768 A.2d at 295 (quoting *Annenberg*, 757 A.2d at 348). While the Court recognized that this doctrine entrusted broad power to the tribunals tasked with opining on such general prayers for relief, the Court cautioned that this was not a "carte blanche" grant to render any award whatsoever. *Id*. "Rather, such an award, must at bottom, redress the harm alleged to have occurred." *Id*. Because the union's statements did not specifically complain that Captains were performing the job of Staff Inspectors without the attendant pay increase, but only complained of dwindling staff numbers, the Court reasoned that it was "too great a leap of logic" to conclude that the statement implicated the out-of-class pay award. *Id*. Specifically:

13

> [I]n the context of the [union's] demand for arbitration, the arbitrator could consider a number of different remedies to rectify the diminution of Staff Inspectors. Yet an out-of-class pay award does nothing to increase the numbers of Staff Inspectors. Rather, it is a remedy to compensate those officers who were allegedly underpaid for performing work normally assigned to Staff Inspectors.

*Id.* at 295. Therefore, "the out-of-class pay claim was not properly encompassed within the demand for arbitration." *Id.*

Next, the Supreme Court sought to determine whether the arbitrator nevertheless possessed jurisdiction over the issue. *City of Philadelphia*, 768 A.2d at 296. The Court observed that the pertinent collective bargaining agreement mandated that: "After the arbitrator is appointed, no new or different claim may be submitted except with the consent of the arbitrator and all parties." *Id.* Because Philadelphia objected to the inclusion of the issue on the first day of the arbitrator's hearing, the Court agreed with Philadelphia that the arbitrator lacked the necessary jurisdiction to award out-of-class pay. *Id.*

Here, we need not go further than the first prong. The FOP's grievance complained that the premium equivalent rates were inflated, *i.e.*, inaccurate, and specifically sought a refund for *any* resulting overpayment. *See* Arbitrator's Decision, 4/21/2023, at 2-3 ("Refund all overpayments beyond the 2016 rates immediately."). Because the subsidy turns on the premium equivalent rate in place at the time of the officers' retirement, an inflated premium equivalent would lead to retirees' overpaying beyond the 2016 rates because of a resulting reduced subsidy. At bottom, then, the Arbitrator's award redresses the harm alleged by the FOP and, unlike *City of Philadelphia*, the instant grievance adequately implicated the subsidy issue. To hold otherwise would be to "suggest that a demand for arbitration must be

crafted with the exacting specificity of a complaint" despite our Supreme Court's admonition to the contrary. *City of Philadelphia*, 768 A.2d at 295 n.2.

## B. Due Process

Accepting, *arguendo*, that the Arbitrator's award was within her jurisdiction,[4] the City contends the Arbitrator failed to observe the requirements of due process when she conducted the arbitration thereby obviating the extreme deference we owe to the Arbitrator's decision. City's Brief at 27. Observing that our Court has charged arbitrators with providing "notice and the opportunity to be heard in a full and fair hearing before an impartial decisionmaker[,]" the City believes that the Arbitrator frustrated due process when she prevented the City from "fully" cross-examining the FOP's expert witness regarding potential computational errors and also by denying the City additional time to review these records. *Id*. at 28. Despite the Arbitrator's assurances otherwise, the City believes that the Arbitrator's decision rested solely on the FOP's expert's evidence, rather than his methodology. *Id.* In support of this argument, the City likens the instant matter to *City of Philadelphia v. Fraternal Order of Police, Lodge No. 5*, 932 A.2d 274, 286 (Pa. Cmwlth. 2007) (hereinafter, *FOP, Lodge No. 5*). City's Brief at 27.

For its part, the FOP reminds this Court that arbitrators are "accorded a certain flexibility to reach an amicable solution" in order to give effect to both the spirit and letter of the agreement. FOP's Brief at 59. The FOP believes the Arbitrator correctly relied on its expert witness because its expert relied on the City's

---

[4] As indicated, the City argues, at times verbatim to its earlier argument, that the Arbitrator lacked jurisdiction to issue an award concerning retirees' subsidy. *See* City's Brief at 24-26. However, at this point the City argues the award thereby violates due process. *Id*. Because we have already resolved the issue of jurisdiction, we do not address these arguments here. We simply note this assertion to ensure we are capturing the full breadth of the City's myriad arguments.

15

own calculations but asserted that the City erred in applying the language of the Working Agreement, *i.e.*, utilized the incorrect methodology. *Id*. at 57. Further, the Arbitrator also noted that the City neglected to offer testimony or evidence to refute the expert. *Id*. at 58.

Again, we agree with the FOP. Initially, we are perplexed by the City's assertion that its counsel was prevented from fully cross-examining Einhorn, because a plain reading of the Arbitrator's hearing transcript suggests otherwise. In reality, the City's counsel was able to cross-examine the FOP's expert witness and did so by inquiring about errors regarding the exact figures to which the expert witness testified. *See* Arbitrator's Hearing, N.T., 11/16/22, at 5-29; R.R. at 46a-53a.

Further, the present matter bears shockingly little resemblance to the facts underlying *FOP, Lodge No. 5*, 932 A.2d at 277-78, wherein the arbitrator – overseeing a grievance arbitration – denied the City of Philadelphia (again, Philadelphia) its day in court by excluding the testimony of *any* of its witnesses or documentary evidence. The arbitrator did so because of Philadelphia's unintentional failure to comply with a subpoena and its alleged misdeeds towards individuals unrelated to the matter under consideration. *Id*. at 279. We observed "that past wrongful conduct between parties to a collective bargaining agreement may not form a foundation for imposing penalties in a subsequent case involving a different grievant." *Id*. at 283. After discussing a number of other cases unrelated to Act 111 arbitration, we nevertheless held "[that t]he cases . . . although not exactly on point, all counsel towards *not* dismissing a case or eliminating a party's relevant evidence based on an unintentional error that is timely cured." *Id*. at 286.

Yet, here, there is no similar allegation of the City's unintentional, but timely cured, error which resulted in the exclusion of relevant evidence. Rather, the

City *neglected to offer any evidence or testimony* which may have rebutted Einhorn's testimony regarding his interpretation of the calculation required under the Working Agreement. It is therefore unclear how *FOP, Lodge No. 5* is probative here.

Finally, to the extent that the City argues that it failed to present relevant evidence because it was not afforded proper notice of the subsidy issue, we must likewise disagree.[5] The Arbitrator's 2018 interest award regarding active officers explicitly retained jurisdiction "as it relate[d] to retiree benefits." Similarly, in the 2020 Memorandum of Understanding, the parties explicitly agreed that the Arbitrator retained jurisdiction to address "retiree health insurance." R.R. at 438a. It is perplexing how the grievance, which sought a refund for any resulting overpayment beyond the 2016 rates, as well as the express retention of jurisdiction in the 2018 interest award and 2020 Memorandum of Understanding, would fail to apprise the City that the issue of the subsidy or the accuracy of the City's figures pertaining to the same would be discussed at the hearing. The issue, then, was not the City's lack of notice, but the City's lack of foresight.

In sum, given the extreme deference we owe to the Arbitrator's decision, we must uphold the Arbitrator's award because the FOP's grievance implicated the subsidy issue, thereby conferring the Arbitrator with the necessary jurisdiction to award the FOP reimbursements in the amounts of $257,333.32 and $233,089.78 for 2017 and 2018, and, at all times, the Arbitrator ensured that her hearings conformed with due process mandates.

---

[5] For the foregoing reasons, we also disagree with the City's remaining scattershot arguments. For example, the City believes that the issue regarding retirees' premium equivalent rates was already resolved, as indicated by the FOP's own testimony, thereby precluding the Arbitrator's jurisdiction. City's Brief at 22-23. It is clear to us, by way of the Arbitrator's retention of jurisdiction, as well as the City's agreement to the Memorandum of Understanding, that the issue continued to exist and that the City should have been on notice regarding the subsidy issue.

# IV. Conclusion

Accordingly, the trial court's order is affirmed.[6]

_____

MICHAEL H. WOJCIK, Judge

_____

[6] On May 23, 2024, we granted the City's oral application for post-submission communication to discuss after-discovered evidence to determine whether we should remand this matter to the trial court with instructions to further remand to the Arbitrator for additional factual findings. *See* Commonwealth Court 5/23/24 Order (citing Pa.R.A.P. 2501(a) ("After the argument of a case has been concluded . . . no brief, memorandum or letter relating to the case shall be presented or submitted . . . except by application or when expressly allowed at bar at the time of argument.")).

Briefly, the City and FOP have recently engaged in another round of arbitration pertaining to the exact same issue, but for the year 2023 (in which the City *overpaid* its contractual obligations to retirees). In the midst of these proceedings, the City discovered a discrepancy between data used by the FOP's witness in the instant matter and the data presented by its own expert witness in the most recent round of arbitration – pertaining to retirees' subsidy for the same time period. The City believes that this "discrepancy bears upon any damages determination that may be legally appropriate at this time for withholdings from pension payments in 2017 and 2018." *See* City's Post-Submission Commc'n at 2-3. The City therefore asks this Court to vacate the trial court's order and remand to the trial court with instructions to further vacate the Arbitrator's award and remand to an arbitrator to resolve this discrepancy. *Id*. at 3. By way of response, the FOP warns this Court that should we do as the City wishes, we would exceed both our scope and standard of review in Act 111 matters. *See* FOP's Post-Submission Commc'n.

For lack of a better phrase, the City's after-discovered evidence is too little, too late. As we made clear above, although our standard of review is plenary regarding pure questions of law or the application of law to undisputed facts, "[w]e are bound, . . . by all determinations of fact and issues of law not encompassed by the standard of narrow *certiorari*, **even if incorrect**." *City of Philadelphia v. Fraternal Order of Police Lodge No. 5 (Breary)*, 985 A.2d 1259, 1266 (Pa. 2009) (citing *Town of McCandless*, 991 A.2d at 1000) (emphasis added).

Our review of the City's post-submission communication indicates that the City wishes to contest the Arbitrator's factual determinations regarding its underpayment to retirees for the years 2017 and 2018. However, our standard of review expressly forbids as much. Indeed, to the extent this evidence is probative, it was best suited for the Arbitrator's review. Because the City's after-discovered evidence seeks to contest a factual determination long after it would be appropriate to do so, we must uphold the Arbitrator's award.

18

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

City of Pittsburgh,                     :

                                    :

              Appellant    :

                                      :

          v.                 :  No. 1174 C.D. 2023

                                      :

Fraternal Order of Police     :

Fort Pitt Lodge No. 1        :

# **O R D E R**

AND NOW, this 22nd day of January, 2025, the Order of the Court of Common Pleas of Allegheny County dated September 7, 2023, in the above-captioned matter is **AFFIRMED**.

_____

MICHAEL H. WOJCIK, Judge